OF THE

## STATE OF MISSOURI

AT THE

### APRIL TERM, 1901.

*( Continued from Volume 162.)*

## HANNIBAL & ST. JOSEPH RAILROAD COMPANY, Appellant, v. FROWEIN.

Division Two, May 21, 1901.

1. **Conditional Deed to Railroad:** CIRCUMSTANCES: USES. Opposite the eastern terminus of a railroad on the Mississippi river was a prosperous town in Illinois. The railroad had no bridge to span the river, and the western bank for three miles was owned by defendant's grantor, who also owned a ferry, with facilities for the transfer of passengers and freight, and who was deeply interested in not having a rival ferry established, and in securing the carriage of passengers and freight to the Illinois town. Therefore, he deeded the land in suit to the railroad company upon the continuing consideration that the company would "locate, construct and operate a railroad over and across" his lands, and providing that the lands "are conveyed strictly and exclusively for the railroad uses of the company, and for no other uses and purposes whatsoever," and the company was further

Vol 163 mo—1 (1)

forbidden to sell or lease any part of the land or build any structure thereon except such as were necessary and appropriate for railroad business alone. *Held*, that this deed did not convey an absolute unconditional title, and the railroad company having ceased to use the land for the purpose named in the grant, could not recover it in ejectment against a subsequent grantee of the ferryman.

2. ———: ABANDONMENT: USES: FORFEITURE. Because the railroad company has not entirely abandoned the track on the land granted, it does not follow that the title has not reverted because of an abandonment of the use. Where the company has unequivocally abandoned every and all use of the property which was in any degree beneficial to the grantor in the deed, or to his assigns, and thus the considerations upon which he granted the land ceased and the limitation upon which the company obtained the use thereof determined, the use and estate itself ceased, and the title reverted to the grantor, and as he was in possession, he was not required to re-enter or bring an action to declare a forfeiture.

3. ———: USES: CONTEMPORANEOUS CONSTRUCTION. The deed conveyed certain lands to a railroad company in consideration that the company would use no other ferry for its passengers and freight across the river, but would turn over to the grantor's ferry all passengers and freight, without any limit as to time. This was done for ten years, but about 1868 the company built a bridge across the river above the ferry, and thereafter ceased to use the ferry, and ceased to use its tracks on the land to carry freight and passengers to the ferry, and when a lumber company applied to the superintendent of the railroad to lease the land, its representative was by him sent to the grantor in the deed, and with full knowledge and consent of the railroad company the grantor leased the land for ten years to the lumber company, and it bought the depot and warehouses of the railroad thereon, and used them in its lumber business, and when its lease expired the grantor bought said buildings of the lumber company, and went into actual possession, and rented said houses to various tenants, and he and his grantees have remained in possession ever since. *Held*, that the contemporaneous construction put upon the deed by the parties themselves was that it was only intended to grant to the railroad company an easement over the land so long as it continued to maintain and operate a railroad for the carriage of passengers and freight to and by way of the grantor's ferry, and the railroad company having ceased to operate and maintain the railroad, the use and easement ceased, and the title reverted to the grantor, and by his deed to his grantees.

Appeal from Marion Circuit Court.—*Hon. Reuben F. Roy,* Judge.

AFFIRMED.

*Spencer & Mosman* for appellant.

(1) The trial court, in respect to the question of abandonment, did not find that plaintiff had entirely abandoned all claim to said tract of land, and all right to use it for any railroad purpose whatsoever. Its finding was that "plaintiff ceased to use any portion of the strip five hundred feet in width conveyed by deed from John Taylor except for the purpose of the storage of cars, and that such non-user was with the intention on the part of the plaintiff to abandon its route over said land, and to adopt the track leading across the bridge over the Mississippi river in place of its former route." This was nothing more than a finding that there had been a cessation of a particular use of the land, viz., as the route for the main line of its road. Cessation of use is not abandonment. The distinction between ceasing to use a tract of ground for a particular purpose, and the entire abandonment of all claim to the ownership of the land, and all right to use it for any purpose whatever, is very clear. Yet the trial court awarded the land to the defendant because its use for a particular purpose, under the exigencies of commerce, had been abandoned. "Mere nonuser of a way or easement created by deed, without proof of adverse enjoyment by the owner of the land, is not sufficient proof of an abandonment of the right." Bannon v. Augier, 2 Allen, 128; Arnold v. Stevens, 24 Pick. 106. (2) We contend that this finding that the non-user by the plaintiff was with the intent to abandon its route over the land does not entitle the defendant to a judgment. To have that effect there

should be evidence tending to show a relinquishment, a surrender of all right to use the land.   1 Am. and Eng. Ency. of Law, p. 1, and note 5; Hickman v. Link, 116 Mo. 127; Clark v. Hammerly, 36 Mo. 639; Pierce v. Fugate, 49 Mo. 450; Tayon v. Ladue, 33 Mo. 208.   To constitute an abandonment of easement, acquired by grant, acts must be shown of such an unequivocal nature as to indicate a clear intention to abandon.   Dyer v. Sandford, 9 Metcalf, 395; Hayford v. Spokesfield, 100 Mass. 491; Roanoke Inv. Co. v. Railroad, 108 Mo. 64; Railroad v. Railroad, 129 Mo. 70.

*F. L. Schofield* and *H. J. Drummond* for respondent.

(1)   The deed under which plaintiff claims did not convey an absolute title.   The premises were "conveyed strictly and exclusively for the railroad uses of the said company, their successors and assigns, and for no other uses and purposes whatever."   This amounted to a condition or limitation in the estate conveyed.   The "railroad uses" to which the grantee might devote the property, must be ascertained by and limited to the manifest intention of the parties as gathered from the whole instrument.   This intention was obviously that the railroad company should locate, construct and operate a railroad over and across the land to Taylor's ferry landing, and deliver to Taylor, for transportation across the Mississippi river, all its freight and passengers to and from the city of Quincy, so long as said Taylor and his assigns should keep and operate a ferry of sufficient capacity to perform the company's ferry business with dispatch.   This was the continuing consideration for which the deed was executed.   These were the "railroad uses" to which the estate granted was limited.   When the plaintiff abandoned these uses, and by diverting its road with all its business to the bridge, and tearing up its tracks and side-

tracks to the ferry landing, and selling off its terminal build-ings, put it out of its power to use the land for any railroad purpose or use beneficial to Taylor, the estate conveyed in the deed thereby ceased and determined. An implied condition, or condition in law, is one which the law implies either from its being always understood to be annexed to certain estates or as annexed to estates held under certain circumstances. 6 Am. and Eng. Ency. of Law, p. 500; 2 Washburn Real Prop., 2, 3; Tiedeman Real Prop., sec. 271; Ellis v. Kyger, 90 Mo. 600; O'Brien v. Wagner, 94 Mo. 93; Clarke v. Brookfield, 81 Mo. 503; Messersmith v. Messersmith, 22 Mo. 369; Tiede-man Real Prop., sec. 281; 2 Washburn Real Prop., 23, 26; 4 Kent Com., 128; Owen v. Field, 102 Mass. 90; Smith v. Smith, 23 Wis. 176; Dumey v. Schoeffler, 24 Mo. 170; Ashley v. Warner, 11 Gray, 43; Witt v. Railroad, 38 Minn. 122; Miller v. Miller, 17 Or. 423; Cravens v. White, 73 Tex. 577; Bassett v. Budlong, 77 Mich. 338; Close v. Railroad, 64 Iowa 149. The controlling canon for the construction of deeds, as of wills and other instruments of writing, is to ascertain the meaning of the grantor from the words he uses, in the light of the circumstances which surrounded him and attended upon his use of them. Long v. Timms, 107 Mo. 512; Bruensmann v. Carroll, 52 Mo. 313; Gibson v. Bogy, 28 Mo. 478; Davis v. Hess, 103 Mo. 31; Long v. Wagner, 47 Mo. 178; Wolfe v. Dyer, 95 Mo. 545; McCullock v. Holmes, 111 Mo. 445; Lake-nan v. Railroad, 36 Mo. App. 363. (2) Plaintiff must be held to have abandoned the whole of the conveyed strip of land. Its ceasing to run and operate its railroad as a railroad, over and across the land to the ferry; its building a new railroad around and away from the land and ferry to the bridge; its absolute and permanent quitting of every use which the deed clearly intended, and putting it out of its power ever again to resume such use, amounted to an abandonment in law without

further proof of intention. Ins. Co. v. Railroad, 108 Mo. 50; Railroad v. Railroad, 129 Mo. 62; Scarritt v. Railroad, 148 Mo. 676; Stacy v. Railroad, 27 Vt. 39; Hickox v. Railroad (Mich.), 44 N. W. 143.

GANTT, J.—This is an action of ejectment for two tracts of land, each located within and constituting a part of a certain tract containing 24.76 acres lying partly in fractional section two and partly in fractional section 3, township 59, range 5, west, in Marion county, Missouri, a strip of ground five hundred feet in width along the west bank of the Mississippi river and extending westwardly a distance of 2,209 feet.

The petition is in the usual statutory form. The answer, while lengthy, is necessary to a proper understanding of the respective claims of the parties and is as follows:

"Defendant, for answer to the petition of plaintiff filed herein, admits that plaintiff is a corporation and also admits that defendant is in the possession of the two pieces of ground described in said petition, but denies each and every other allegation contained in said petition.

"Defendant further answering, states, that on the fifteenth day of April, A. D. 1859, and for three or more years prior thereto, there was and had been existing a railroad company, duly incorporated and organized under the laws of the State of Missouri, by the name of the Quincy & Palmyra Railroad Company, and that at and during said times John Taylor was the owner in fee of all the land described in plaintiff's petition, and also the owner of a ferry franchise, and was engaged in running ferryboats for the transportation of passengers and freight for hire from the city of Quincy in the State of Illinois across the Mississippi river to the town of West Quincy in the State of Missouri, where he had a ferry dock and other appliances and facilities on said land for

landing ferryboats and discharging passengers and freight thereon. Defendant further states that on the said fifteenth day of April, 1859, said John Taylor remised and released to the said Quincy & Palmyra Railroad Company an easement or right of way over and through the said entire tract of 24.76 acres of ground described in the petition of the plaintiff, from the westerly part of said tract to the said ferry landing on the bank of the Mississippi river, said right of way to be used only and strictly for railroad purposes, and defendant avers that said grant was made by the said John Taylor and accepted by the said Quincy & Palmyra Railroad Company, in consideration for and in pursuance of a contract made by and between them, by which the said Quincy & Palmyra Railroad Company contracted and agreed to locate, construct and operate a railroad over and across the said tract of land to the said ferry landing, and would operate, use, and run said railroad in connection with said ferryboats so owned and run by the said John Taylor as aforesaid, and that the said parties to said contract and agreement would each and reciprocally receive from, and deliver to, the other, at said ferry landing, and would transport therefrom, on their several lines of transportation, all of the freight and passengers so carried as aforesaid by them thereto.

"Defendant further states that said Quincy & Palmyra Railroad Company did, in pursuance of said contract and agreement, locate and construct a railroad over and across the tract of 24.76 acres of ground to the said ferry landing and did operate and run the same in connection with said ferry from the latter part of the year 1859 to the latter part of the year 1868, in which latter year the plaintiff bought of the said Quincy & Palmyra Railroad Company the latter's said railroad, together with all the franchises, privileges and property owned in connection therewith and became obligated for all

the duties and bound by all the contracts and agreements made by the said Quincy & Palmyra Railroad Company, and particularly the contract and agreement so as aforesaid made with said John Taylor.

"Defendant further states that when plaintiff became the purchaser of said Quincy & Palmyra Railroad as aforesaid, plaintiff was, and long prior thereto had been, a railroad corporation engaged in operating and running its railroad from Hannibal to St. Joseph and Kansas City, and over the said Quincy & Palmyra Railroad to said ferry landing, all in Missouri, by and under whose laws it was duly organized as such corporation, and at said time plaintiff took up and removed from said tract of 24.76 acres of ground all of the ties, rails, tracks, sidetracks, switches, cars, locomotives and every other appliance used in operating and running said Quincy & Palmyra railroad over said tract of land, and sold its depots, freight houses and every other structure used by said railroad on the said tract of land, and then abandoned the use and control of said 24.76 acres of land as formerly had and made of same by the said Quincy & Palmyra Railroad Company and plaintiff, and plaintiff located a railroad over and across another and entirely different tract of land, and made a connection of said last railroad with a railroad bridge across the said Mississippi river about one-half mile north of said ferry landing and one quarter of a mile north of said tract of 24.76 acres of land, and thereafter there was no connection of any railroad with said ferry, nor was either passengers or freight transported to or received at said ferry landing from any railroad, and plaintiff ever thereafter transported the freight and passengers carried by its said railroad and destined for either side of the Mississippi river, across the same on said railroad bridge. Whereupon, whatever right, title or interest, use or easement was granted 'as aforesaid by the said John Taylor to the said

Quincy & Palmyra Railroad Company reverted to the grantor, and he then and there entered into the actual occupation and possession of the said 24.76 acre tract of land and he and his grantee have and has been and remained in such possession ever since such entry.

"Defendant further states that he is the owner in fee of all the land described in plaintiff's petition by a conveyance and intermediate conveyances from John Taylor down to him, and he further states that he, and those under whom he claims, have been in the actual, adverse, exclusive, continuous, visible, open, notorious and hostile possession of all of said lands, including the two pieces thereof described in plaintiff's petition, for more than ten years next before the institution of this suit, and defendant avers that he and those under whom he claims said land, have been in such possession for more than twenty-five years next before the commencement of this suit.

"Wherefore, defendant says that plaintiff ought not to recover the possession of said lands or any part thereof, and having fully answered, he asks to be allowed to go hence with judgment for his costs herein."

To which answer plaintiff filed the following reply: "Now comes the above named plaintiff and for reply to the new matter set up in the reply, denies each any every statement and allegation thereof."

The finding and judgment of the circuit court was for the defendant, and the plaintiff appeals.

The evidence developed the following facts:

The Hannibal & St. Joseph Railroad Company was incorporated by a special act of the Legislature of Missouri, February 16, 1847. By the special act approved March 2, 1867, it was authorized to purchase and own the railway and property of the Quincy & Palmyra Railroad Company.

In the year 1859, Captain John Taylor was the owner of

lands extending for three miles along the west shore of the Mississippi river, opposite the city of Quincy, Illinois. On the fifteenth day of April, 1859, he made and entered into an indenture with the Quincy & Palmyra Railroad Company, through its president, Samuel Holmes, by which said John Taylor and his wife for and in consideration, as well of the agreement of the said party of the second part made with said John Taylor of the first part to locate, construct and operate a railroad under the provisions of its articles of association, over and across the lands hereinafter granted and conveyed, as also the sum of five dollars, "did remise, release and quitclaim" unto said Quincy & Palmyra Railroad Company, their successors and assigns, the certain tract of 24.76 acres already mentioned in this statement. "To have and to hold the said described premises with all the privileges thereto appertaining unto the said Quincy & Palmyra Railroad Company, their successors and assigns forever, *but nevertheless* as the said premises so hereby *conveyed are conveyed strictly and exclusively for the railroad uses of the said company, their successors and assigns and for no other uses and purposes whatever the same shall be enjoyed by the* said grantees herein with the reservation and upon the condition that neither the said company, their successors or assigns shall lay off any portion of the said premises into building lots for the purpose of leasing or selling the same, nor permit any person to erect on said premises any tavern, hotel or other house of public entertainment," with certain penalties prescribed for a violation of these provisions.

In addition to the above, the deed also contained the following among other "reservations," "conditions" and "agreements:" "And whereas, the said John Taylor is the owner and operator of a certain ferry and ferry privileges at or near the location of said parcel of ground, now, this conveyance is

made by the said John Taylor and accepted by the said railroad
company upon the further reservation and agreement between
the said grantor and the said company, that the said company
and those claiming under them, will not establish or cause to
be established or operate a ferry so long as John Taylor, his
heirs or assigns, shall keep and operate a ferry at said point,
of sufficient capacity and strength to do and perform at all
proper times and with reasonable dispatch the business of said
company, their successors or assigns, such as crossing passen-
gers and freight across the Mississippi river." It then fur-
ther provided that in the event of fire or other casualty to Tay-
lor's boats, the company might procure and temporarily run
boats of its own under Taylor's ferry privilege, and finally
that "for the receiving and discharging with reasonable dis-
patch of all freight and passengers which he may ferry to or
from said Quincy and Palmyra railroad" he should have the
free use of any wharf or landing.

After the execution of this deed the Quincy & Palmyra
company entered upon the land and constructed its railroad
from the western limit of the 24.76-acre tract through to the
Mississippi river, to the landing of John Taylor's ferry boats,
over which all the passengers and freight of said company and
of the Hannibal & St. Joseph to and from Quincy, Illinois,
were transported across said river.

Plaintiff's predecessor built upon the eastern portion of
said 24.76-acre tract, and it and plaintiff used in connection
with their business, a passenger depot, ticket and telegraph
office, a large warehouse for handling and storing freights for
or after carriage, a car scale for weighing loaded cars, and
also a number of other erections and improvements including
a number of switches, sidetracks and other terminal facilities.

That in the year 1868 a railroad bridge across the Missis-
sippi river at Quincy was built about three-quarters of a mile

north of said ferry landing, uniting the western or Missouri bank with Quincy.

That immediately after the completion and opening of said railroad bridge for traffic, the plaintiff built and completed and thence continued to operate its railroad to and over said bridge, departing from its old track at a point about three hundred yards west of the western end of said conveyed 24.76-acre tract of land, and passing west and north of same extended to said bridge over which it thereafter operated its railroad into the city of Quincy, and so continued to run all of its freight and passenger trains over said new road and bridge and received and discharged all of its freight and passengers from or destined to said city of Quincy at its station in said city and ceased thereafter to use said conveyed land, and the railroad thereon for the transaction of its freight and passenger traffic to and from said city of Quincy.

That at or about the said time of the completion of said railroad bridge, plaintiff also built a new passenger and freight depot, sidings, switches and other station facilities upon the line of its said new road about one-half mile from the west end of the bridge and about the same distance from its old stationhouse on said conveyed land near the Taylor ferry landing.

That shortly after the opening of said railroad bridge and during the same year, 1868, plaintiff's superintendent saw a member of the firm of Bradford, McCoy & Company, wholesale dealers of the city of Quincy, and suggested to him the removal of their yards and business over to West Quincy, and proposed to lease to said firm the said conveyed land for that purpose. The suggestion being received favorably, said plaintiff's superintendent promised to look further into the matter and a few days later again met Mr. Bradford, a member of said firm, and told him he had ascertained that the railroad

company had no right to lease to said firm the said land but referred him to said John Taylor as the proper party with whom to make the desired arrangement. That thereupon, after some negotiating with said John Taylor, Bradford, Mc-Coy & Company leased of said John Taylor the exclusive use for lumber-yard purposes, for a term of ten years from 1868 to 1878, the west bank of the Mississippi river for a distance of three miles, including the said conveyed land and lands adjoining, and immediately removed their lumber yards to and upon the same. At or about the same time said firm also bought of plaintiff its old depot and a large warehouse building which said firm continued to use in its business for the whole period of its lease, viz., till during the year 1878, when, upon its ceasing business, it sold said building to said John Taylor. Said Taylor went into the possession of same and afterwards rented the warehouse to various tenants and continued in the possession and occupancy of same till its final destruction and removal by his grantees within a few years last past; he also converted said depot building into a double dwelling house which he and those claiming under him, including defendant, rented to various tenants until within the last few years, when it was finally removed.

That after the termination of the lease of Bradford, Mc-Coy & Company and their removal from the premises in the year 1878, said John Taylor leased a portion of the east end of said conveyed 24.76-acre tract, including a part of the second piece of ground sued for by plaintiff, and embracing the old freight or warehouse which stood upon same, to a tile manufacturing company, which erected upon same a large kiln for the burning of tiles, and occupied same and said old warehouse in the conduct of its business for about two or three years, digging soil from said premises for use in the manufacture of tiling.

That for the first two or three years of the occupancy by Bradford, McCoy & Company, plaintiff kept an office and telegraph station for the accommodation of said firm in said old depot building, in addition to its said new station on its said new extended line about a half mile distant, but finally in the year 1871, plaintiff ceased to keep said office and telegraph station on said premises.  But during the occupancy by said firm of Bradford, McCoy & Company, plaintiff received from said firm on said land their cars loaded with lumber by said firm for transportation; but during that time plaintiff's business conducted upon said conveyed land was confined to that appertaining to said firm of Bradford, McCoy & Company.

That all freights for transportation over plaintiff's road after 1878, when Bradford, McCoy and Company ceased business, was received by plaintiff only at its new station on its said extended line or in cars placed upon side tracks near said new station; and that the product of the tile factory which immediately succeeded Bradford, McCoy & Company, intended for shipments over plaintiff's railroad, was required by the plaintiff to be hauled in wagons out to said new station, the distance of about one-half mile.

Defendant is the owner by mesne conveyances of all the right and title of John Taylor.

The evidence further tended to prove that since the opening of the railroad bridge in 1868, the plaintiff had wholly ceased all use of the said conveyed lands except as follows, viz.:    that until the year 1873 it had kept a telegraph station and office in the old depot thereon, chiefly for the accommodation of said firm of Bradford, McCoy & Company, and had also during the occupancy by said firm, until the year 1878, used its tracks on said land in the handling and shipment of lumber for said firm, and except also that since 1878 (with the exception of about one year when its bridge had been des-

troyed) it had maintained its original main track, rebuilding said bridge twice and repairing it and the tracks on and over said land from the western end thereof to a point within three hundred to five hundred feet of the eastern end thereof, frequently relaying the western portions of the track with heavier rails than had previously been used on the main line, and continuously, used said track for the purpose of storing cars thereon and for receiving cars from and delivering cars to other railway lines, but that at one time, about the year 1891, a bridge or culvert seventy-five feet long near the western end of said land washed out and was not rebuilt until about a year thereafter, during which year no use was made by plaintiff of its track east of the culvert on said land.

The evidence also tended to prove that all of plaintiff's track, including said main track and side tracks for a distance of several hundred feet from the eastern end of said land, that is to say, to a point westward of the westward line of the piece of ground sued for (nearest the river), had been torn up by the plaintiff, so that no use was made of said portion of said conveyed land by the plaintiff. Shortly after the removal of Bradford, McCoy & Company, plaintiff took out and removed its said car scales.

It is agreed that the lay of the ground in controversy, the said conveyed tract of 24.76 acres, the plaintiff's tracks over same, and its said new track or road from a point west of said land to and over said bridge, as built and operated since 1868, are all correctly shown on the plat attached hereto as a part hereof.

This was all the evidence by either party.

H. & St. J. Ry. Co. v. Frowein.

I.   One of the chief, if not the paramount, question, arising on this record, is what construction and effect shall be given the deed of John Taylor to the Quincy & Palmyra Railroad Company, under which the Hannibal & St. Joseph Railroad Company claims title to the two tracts in controversy.

Counsel differ radically as to the force and effect of that conveyance.

Counsel for plaintiff insists that "the deed contains no words limiting or qualifying the estate conveyed, nor any words showing an intention to convey an estate upon condition, or an intention that in any contingency, the land was to revert to the grantor."

Whereas, with equal confidence, counsel for defendant asserts "the deed did not convey an absolute estate, and the intention of the parties, manifested by the language of the deed itself, forbids the contention that the Quincy & Palmyra Railroad Company or its grantees or assigns, might, as it did, voluntarily put it out of its power to meet and discharge the ever-continuing consideration upon which the estate vested and yet hold the lands under it."

All rules of construction have for their object the ascertainment of the intention of the parties to the instrument. In order to do this the courts must consider the words used in the light of the circumstances which surrounded, attended and waited upon the use of them by the parties. [Long v. Timms, 107 Mo. 519; Witt v. Ry. Co., 38 Minn. 122; Miller v. Miller, 17 Oregon 423.] From this deed we glean the circumstances which called for its execution. Quincy, Illinois, was the eastern terminus of the railroad. No bridge spanned the Mississippi river at that time. Captain Taylor owned a ferry and three miles of the western bank of the river opposite Quincy. The railroad greatly needed connection with a ferry by which to facilitate the transfer of its passengers and freight to and from Quincy across the river. It needed terminal facilities for its switches, warehouses, engine houses, etc. Taylor on the other hand was deeply interested in not having a rival ferry established and in securing the carriage of the passengers and freight on their way to Quincy, and having a large tract of land, it is easy to preceive the mutual interest of each afforded an incentive to the contract. Such were the circumstances. When we look to the recital of a consideration we discern at once that the contract of the railroad company *"to locate, construct and operate a railroad* over and across the lands" of Taylor and furnish passengers and freight for his

ferry, was the true, and by Taylor intended to be a continuing consideration for his grant of land to the company.

The "five dollars" was obviously a mere formal recital, and bore an infinitesimal proportion to the real consideration for the conveyance. That he did not intend to convey an absolute title to the land is evidenced by the provision in his deed that the lands "are conveyed *strictly and exclusively* for the *railroad uses of the company,* their successors and assigns, and *for no other uses and purposes whatever,*" and by the other prohibitions and restrictions which forbade the company selling or leasing any part of it or building any structures other than such as were necessary and appropriate for railroad business alone.

In the light of these circumstances, the language of this deed fell short of conveying an absolute, unconditional title to the 24-acre tract.

Reading the whole deed together, we think it is obvious that it was the mutual understanding and intention of both Taylor and the railroad company that the company should acquire the right to use the property for the tracks and the necessary structures appurtenant to the railroad, which in the deed it contracted "to locate, construct and operate" across these lands, and deliver to Taylor's ferry the freight and passengers going and coming from Quincy, so long as Taylor should provide a ferry sufficient for that purpose.

We can not for one moment entertain the view that by this deed it was the purpose of Taylor to convey to the railroad these lands for *railroad uses alone,* and that a week, month or year later or at any subsequent time the company could remove its tracks, stationhouse, and discontinue the transportation of freight and passengers to Taylor's ferry and thus deprive Taylor of all the benefits which moved him to grant the easement, and yet hold the title to his land, or what is tantamount to

such an abandonment, to do as the plaintiff did in 1868, soon after it bought the Quincy & Palmyra railroad, diverted its railroad from a point west of the conveyed strip around and beyond the ferry to a railroad bridge three-quarters of a mile north of Taylor's ferry, and thenceforth continued to run its trains over said new road and bridge and received and discharged all its freight and passengers in Quincy, and entirely ceased to carry any freight or passengers by said ferry, and tore up its tracks leading to the ferry over the tract of land, marked No. 1 on the accompanying plat, through which it could only reach the ferry; sold its depots, freighthouses to Bradford, McCoy & Company, and only retained a track on the west end of said 24 acres for the storage of old cars.

Learned counsel for the plaintiff say the company "never removed its tracks from said land or gave up or abandoned said land, but continued to use the same." Obviously, by this, counsel does not mean to controvert the fact shown by the record that the company did totally abandon all passenger and freight traffic over Taylor's ferry; nor that it sold its station and warehouse buildings to Bradford, McCoy & Company, and tore up and removed its main and side tracks from tract No. 1, and wholly ceased to use it in any way. What counsel evidently means is, that by retaining a track on the western end of the 24 acres, on which it stores cars, it has not *entirely* abandoned the tract. In a certain sense, counsel is right. The company did keep a track on the west end of the 24 acres for the storage of cars but for years prior to the commencement of this action it compelled the tiling company to deliver all freight intended for shipment at its new station a half-mile distant, and on its new line. What defendant insists, and we think most properly, is that by building around this tract and running its cars over the bridge and abandoning the ferry and by tearing up its tracks, selling its depots and freighthouses, it absolutely

and unequivocally abandoned every and all use of the property which was in any degree beneficial to the grantor, Taylor, and his assigns, and thus the consideration and limitation upon which Taylor granted the use ceased and determined and as a consequence the use and estate itself ceased and the title reverted to Taylor who was in possession and he was not required to re-enter or bring an action to declare a forfeiture. [Clarke v. Brookfield, 81 Mo. 503; O'Brien v. Wagner, 94 Mo. 93.]

That both parties regarded the condition upon which Taylor granted the use of the property as broken, we think the record leaves little room for doubt. As early as 1868, and soon after the plaintiff railroad had built its new line over the bridge to Quincy, we find its superintendent sending Bradford, McCoy & Company to John Taylor to lease the 24-acre tract for a lumberyard; with the full knowledge and consent of plaintiff, Taylor did lease to Bradford, McCoy & Company, the land now in dispute for ten years for a lumberyard, and that firm bought the depot and warehouses of plaintiff and used them in their lumber business, and when that lease expired in 1878, Taylor bought said buildings of said firm and went into actual possession and rented said houses to various tenants, and he and his grantees have ever since remained in possession of tract number 1, up to the commencement of this suit. Conduct more unequivocal as evidencing an abandonment of all claim by plaintiff to that tract can not well be imagined.

Counsel for plaintiff cites Scarritt v. Ry. Co., 148 Mo. 681, as contradicting an intention on its part to abandon, but the most casual reading of that case will show that the Kansas City, Osceola & Southern was a new road, struggling for existence, and was delayed in its effort to get into Kansas City by its poverty, and that the non-user charged against it had lasted about five years, and that the arrangement by which it used the Belt line was only temporary, and that it was its purpose and

intention to enter the city over the track which it was alleged to have abandoned. The facts of that case are widely different from those we are considering. Here, the depots and warehouses were sold, the main and side tracks torn up by plaintiff (not merely covered by a land slide) as early as 1868; a re-entry by the grantor and reassumption of every right pertaining to the ownership of land with the full concurrence of plaintiff.

As to the second tract on the plat, there is not the slightest pretense that the storage track, left on the west end of the 24 acres, touched this tract either.

As already indicated, when we consider not only the language of the deed, but the cotemporaneous construction which both parties placed upon it, we are clearly of the opinion that the deed of Taylor was only intended to grant plaintiff an easement over and through these lands so long as it continued to maintain and operate a railroad for the carriage and transportation of freight and passengers to and by way of Taylor's ferry, and thus incidentally a benefit to Taylor, and that when plaintiff ceased to so operate and maintain its railroad, the use and easement ceased, and the title reverted to Taylor, and by his deed, to his grantees, of whom defendant is the legal successor.

In attempting at this late day to resume the ownership, after having abandoned it for all the time since 1868, at all events since 1878, plaintiff is in no condition to deny the construction which its own conduct placed upon Taylor's deed, and the judgment of the circuit court for the defendant ought not and will not be disturbed, and is accordingly affirmed.

*Sherwood, P. J.,* and *Burgess, J.,* concur.