# CYTRON et ux. v. ST. LOUIS TRANSIT COMPANY, Appellant.

**In Banc, July 2, 1907.**

1. **DAMAGES: Death of Child: Suit Within Year: Limitation Statute.** The statute requiring every suit for damages for the negligent killing of a child, etc., to be begun within one year after the cause of action accrued, is a statute of limitation and being such, if the action is begun by the father alone within one year, and afterwards the petition is amended by bringing in the mother, the cause of action is not barred.

2. ——: ——: ——: ——: **Answering Over.** It is only by considering that statute as one of limitation, that a plea that such an amendment is a departure from the original cause of action can be entertained; for, if it were not such a statute, by answering over defendant waived that plea.

3. ——: ——: ——: ——: **Amended Pleading: New Plaintiffs.** Amendments are allowed expressly to save the cause from the statute of limitations; and when the cause set up in the amended petition is not totally different from that stated in the original petition, the court will allow the amendment. And the substitution of new parties plaintiff is not the commencement of a new suit.

Cytron v. Transit Co.

4. **NEGLIGENCE: Street Crossing: Ringing Bell.** Ordinary regard and care for the safety of the deceased child and others on the street at a crossing required that the bell be rung or other warning be given of the approach of the car, and if because of a failure to give such warning the child was run over and his death was directly caused by that negligence, and neither he nor his parents were guilty of contributory negligence directly contributing to his injuries, the verdict should be for plaintiffs.

5. ———: ———: **Speed of Car.** If defendant railway company negligently runs its street car at a high and dangerous rate of speed at the street crossing, at a rate that a motorman of ordinary care and prudence, would not run his car, in view of the existing conditions as to frequent use and occupancy of the street at the time, and by reason of such dangerous speed a child on the street is run over and killed, and would not have been run over had the car not been run at a negligent speed, the plaintiffs, in the absence of contributory negligence, are entitled to recover.

6. ———: ———: **Vigilant Watch.** If the motorman was not keeping a vigilant watch for all persons, especially children, either on the track or moving towards it, or if the motorman, upon the first appearance to him of danger to the eight-year old child who left the sidewalk and ran towards the track, either directly or diagonally, did not stop his car in the shortest time and space possible under the circumstances, consistent with the safety of his passengers and by the use of the means at hand and under his control, and did not see the child because of a failure to keep such vigilant watch, and the failure to keep such watch, or the failure to so stop the car, was the direct cause of the death of the child, plaintiffs, unless they or the child were guilty of contributory negligence, are entitled to recover.

7. ———: **Contributory and Concurring: Confusing Instruction.** Where the intructions given embody every principle of law applicable to the concrete facts, and relieving defendant of liability because of contributory negligence, an instruction asked by defendant on concurring negligence, which in fact embodies in learned phrase nothing more than the principle already announced, should be refused, as tending to confuse rather than to enlighten the jury.

8. ———: **Passing Suddenly in Front of Car.** Where the petition charged, and the evidence tended to show, an excessive speed, no warning and a violation of the Vigilant Watch Ordinance, an instruction which sought to excuse defendant if the injured child "suddenly passed upon defendant's

track in front of its car and so close thereto that it was impossible for the motorman to stop the same in time to avoid collision with him," did not embody the law of the case, and should have been refused.

9. ———: **Notice.** Where means of notice to the motorman of danger to a child on the street are at hand, notice is demanded by the law.

10. ———: ———: **Giving up Slack: Starting Car.** Where defendant's evidence tended to show that its motorman voluntarily gave up control of his car at the foot of a sharp grade, that he there let go of and thereby turned off the brake, that he was feeding his power at the critical instant of crossing the intersection  of two streets at a thickly settled and busy part of the city, it was for the jury to say whether the brake should have been kept in touch with the wheels, as it was a place where questions of life and death might arise at any time; and the motorman testifying that his car covered thirty feet while he was getting the brakes in contact with the wheels, an instruction which excused defendant if the deceased child suddenly passed upon the track in front of the car and so close thereto that it was impossible for the motorman to stop the car in time to avoid injuring him, was inapplicable to the case and was properly refused.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough,* Judge.

**AFFIRMED.**

*Boyle & Priest, George W. Easley* and *J. W. Jamison* for appellant.

(1) The demurrer to the amended petition should have been sustained. The action is a statutory one for damages for tort to a person resulting in death, which were not recoverable at common law, and the statute gives both a right of action and provides the remedy for death where none existed at common law. Brink v. Railroad, 160 Mo. 92. It is clear that the statute gives a joint remedy to the father and mother for the death of a deceased unmarried minor, and that they must join in the suit and each shall have an equal interest in the judgment, or, if either of them is dead, then by the sur-

vivor. R. S. 1899, sec. 2864. While the statute uses the word "may" join in the suit, yet the code expressly provides that "parties who are united in interest must be joined as plaintiffs or defendants, but if the consent of any one who should be joined as a plaintiff cannot be obtained, he may be made a defendant, the reason therefor being stated in the petition." This section was applied to both actions at law and suits in equity. R. S. 1899, sec. 544; Buel v. St. Louis Transfer Co., 45 Mo. 463, 52 Mo. 457; Coates v. Railroad, 104 Mo. 518; R. S. 1899, sec. 2864; Barker v. Railroad, 91 Mo. 86; Wood on Limitations (3 Ed.), sec. 9; Railroad v. Hine, 25 Ohio St. 629; Boyd v. Clark, 8 Fed. 851. (2) The fourth instruction is erroneous, in that it submits to the jury whether the motorman, by keeping a vigilant watch, could have seen the deceased and stopped the car and averted the collision with, and injury to the child. There was not any evidence whatever as to the ability of the motorman to stop, except that of the motorman himself. That was contrary to the following authorities: Zurfluh v. Railroad, 46 Mo. App. 636; Molyneux v. Railroad, 81 Mo. App. 25; Hauselman v. Railroad, 88 Mo. App. 123; Cogan v. Railroad, 101 Mo. App. 179; Asphalt Co. v. Railroad, 102 Mo. App. 469; Moore v. Railroad, 176 Mo. 528; McGauley v. Railroad, 179 Mo. 583; Roenfeldt v. Railroad, 180 Mo. 554; Reno v. Railroad, 180 Mo. 469.

*Thos. B. Harvey* for respondent.

(1) The demurrer to the amended petition was properly overruled. The petition did not show on its face that the father and mother of the deceased, named as plaintiffs in said petition, had not been joined as plaintiffs in the original petition and within one year after the death of their minor son. The statute requires that only such defects as appear on the face of the petition may be taken advantage of by demurrer.

R. S. 1899, sec. 598; Arthur v. Rickards, 48 Mo. 298; Beattie Mfg. Co. v. Gerardi, 166 Mo. 142; Springfield v. Plummer, 89 Mo. App. 515. If such alleged defect did appear upon the face of the petition, and it was, therefore, subject to demurrer, it would be waived by answering over to the merits. Section 602, R. S. 1899; Jones v. Railroad, 178 Mo. 538. (2) The court committed no error in permitting the mother of the deceased minor to be made a party plaintiff with her husband by an amended petition filed more than one year after the death of said minor. Secs. 658, 659, 660, R. S. 1899. The foregoing sections on amendments should be liberally construed. Harlan v. Moore, 132 Mo. 483; Hayden v. Marmaduke, 19 Mo. 403; Butler v. Lawson, 72 Mo. 227. In order to take advantage of a defect of parties, it must be done in some appropriate manner before trial. The only method adopted by defendant before the trial was by a demurrer, and which was inadequate because it went only to such alleged defects as appeared upon the face of the petition, and no defect of parties appeared upon the face of the petition. By answering and going to trial, defendant waived any alleged defects of parties. Crook v. Tull, 111 Mo. 288; Dunn v. Railroad, 68 Mo. 269; Butler v. Lawton, 72 Mo. 227; Spillaine v. Railroad, 111 Mo. 562; Burnham & Co. v. Tillery & Co., 85 Mo. App. 459; Stewart v. Gibson, 71 Mo. App. 235. The cause of action had been filed in due time by the father as plaintiff and the limitation of the statute was suspended from that time; and it was competent at any time thereafter to bring in any other parties in interest. Senn v. Railroad, 124 Mo. 624; Buel v. St. Louis Transfer Co., 45 Mo. 463; Wood on Limitations (3 Ed.), sec. 9; Floyd v. Floyd, 90 Ind. 130; Vunk v. Railroad, 56 N. J. L. 395; Bradford v. Andrews, 20 Ohio St., 219; Martin v. Young, 85 N. C. 156; Lilly v. Tobbein, 103 Mo. 489. The cause of action is not changed, neither is a new claim asserted, by

bringing in an additional necessary party by amendment. Merrill v. St. Louis, 83 Mo. 248; Hughes v. McDivitt, 102 Mo. 77. See, also, Crockett v. St. Louis Transfer Co., 52 Mo. 460; Lottmann v. Barnett, 62 Mo. 170; Railroad v. Wyler, 158 U. S. 293; Whalen v. Gordon, 95 Fed. 309; Hennessey v. Brewing Co., 145 Mo. 114; Courtney v. Blackwell, 150 Mo. 271; Bricken v. Cross, 163 Mo. 453. (3) There was ample evidence to justify the giving of plaintiff's fourth instruction upon the motorman's failure to keep a vigilant watch and to stop the car upon the appearance of danger to the child. It was plainly a question for the jury to decide, whether he made proper effort to stop the car upon seeing the boy approach the track, or whether he could not stop the car because of its excessive speed.

LAMM, J.—From a judgment against it for five thousand dollars damages for negligently causing the death of plaintiffs' eight-year-old son, Morris, on August 27, 1901, the defendant appeals. The case was assigned to Division One. There the judgment was reversed. On a motion for rehearing two of the members of that division dissented. Thereupon it went to Banc.

The case made on the facts, as well as the paper case on issues going to the merits, will be reviewed presently. Putting them aside for the present, there is a question made on the pleadings calling for consideration and determination *in limine.*

I. The cause was heard below on an amended petition. As originally brought, the father, Meyer Cytron, alone sued. The child was the son of Meyer and Rosie Cytron, husband and wife. Presently, but after one year had elapsed, an amended petition was filed, the amendment consisting in making Rosie Cytron a party plaintiff. Thereupon defendant lodged a demurrer—the force thereof spent on facts disclosed by that amendment, to-wit, the existence of a living mother as

well as a father and a failure to join that mother as a plaintiff in the first petition. The demurrer was overruled, and thereupon defendant answered over. By that answer it renewed its attack on the petition based on the same grounds exploited in its demurrer. Thereby it alleged that the cause of action accrued on August 27, 1901; that Meyer Cytron alone brought suit; that the amended petition was filed on the third day of February, 1903; that the penalty sued for could only be recovered by the father and mother jointly; that suit must be brought within one year, and not afterwards; that such action (under the amended petition) was not brought within one year after said cause of action accrued; and that, the premises considered, the condition of the statute giving the cause of action had not been complied with and plaintiffs were not entitled to recover.

At the close of the case defendant asked and the court refused to give a peremptory instruction. At the beginning of the case defendant objected to the introduction of any testimony because the petition did not state facts sufficient to constitute a cause of action. This objection was overruled—defendant saving timely exceptions to both said rulings. As we see it, it is one or the other of them that defendant now assigns as reversible error, in that by joining Rosie Cytron in the amended petition, the plaintiffs, in effect, instituted a new suit more than one year after the cause of action accrued—all this (it is said) in the teeth of the statute then existing, to-wit, Revised Statutes 1899, section 2868, reading:

"*Limitation of Actions.*—Every action instituted by virtue of the preceding sections of this chapter [chapter 17 on Damages, etc.], shall be commenced within one year after the cause of such action shall accrue."

To avoid the settled rule (hereinafter pointed out)

that the stiff letter of the statutory term of limitation may be gently coaxed or relieved against by the benevolent interpretation and application of the code provisions on amendments, defendant's learned counsel argue that the foregoing section is not so much a statute of limitation as it is a statute creating a *condition.* That as a condition it is distinguished from a limitation in the right of amendment and the party must bring himself rigidly within the condition to be entitled to recover. They say the statutory condition was that the suit should be brought by the husband and wife within the year prescribed; that both the right of action and the remedy are created by statute; that it gives a joint remedy to the father and mother for the death of a deceased unmarried minor; and that they have an equal interest in the judgment, *ergo,* must join in the suit at its inception. Failing to comply with that condition, they argue, plaintiffs should be cast.

But we do not agree with that view. It seems to us that the argument of defendant's learned counsel proceeds on an over-refinement. The statute in hand is not a span more or a whit less than one of limitation and repose. Its passport as such statute is stamped on its very face, because it is written there that it is a statute with an honest purpose of limitation and repose only. The Legislature, intending it to fill that office, said so in so many words—the subhead of the section reading, ''Limitation of Actions.'' We ought not to allow that obvious legislative intent to perish by construction; and by repeated adjudications we have so construed the statute as to preserve its life. For example, it has been construed as a statute of limitation merely in Walker v. Railroad, 193 Mo. l. c. 474, *et seq.;* Buel v. Transfer Co., 45 Mo. l. c. 563; Crockett v.

Transfer Co., 52 Mo. 457; Senn v. Railroad, 124 Mo. l. c. 625, *et seq.*

Indeed, it is only by the grace of allowing the averment of the answer, now under exposition, to be taken as a plea of the one-year Statute of Limitations that any life is left in it—or that it has place in an answer. And this is so because, *strictissimi juris,* in so far as the amendment may be claimed to constitute a departure, that departure, as such, was waived by answering over (Walker v. Railroad, supra, l. c. 473; Liese v. Meyer, 143 Mo. l. c. 556); and, being waived, the right to object to it is gone unless we interpret the plea as a plea of the Statute of Limitations, and, hence, a substantive defense.

Being a statute of limitation, and the question under consideration in final analysis involving the right of amendment after the limitation has run, at the threshold lies the inquiry: "What is the proper judicial attitude toward amendments with reference to the Statute of Limitations?" As said in Walker v. Railroad, supra: "The answer, in the language of NAP-TON, J., in Lottman v. Barnett, 62 Mo. l. c. 170, is: 'Amendments are allowed expressly to save the cause from the Statute of Limitations, and courts have been liberal in allowing them, when the cause of action is not totally different.' The rule thus announced is steadily applied. [Lilly v. Tobbein, 103 Mo. l. c. 490-1; Courtney v. Blackwell, 150 Mo. l. c. 271-2]"

In the Walker case a father sued for the negligent death of his son, giving a wrong name. After one year he amended by alleging the right name. It was held the amendment was within the purview of the judicial construction put upon the liberal provisions of our code, citing Revised Statutes 1899, sections 657-8-9, 660, 672, 676 and 865.

In the Buel case the father and mother had been divorced. He refused to join her in a suit to recover

damages for the death of their minor child. Thereupon she sued alone, making him a defendant. After eighteen months the petition was amended so as to make the father a co-plaintiff; and the amendment was held well enough.

The Lilly case was a suit to establish a rejected will, commenced in the name of an unincorporated society. A demurrer was sustained because of the want of capacity of plaintiff to sue. Thereupon an amendment was allowed, after the period of limitation had expired, permitting members of the church to sue in their own behalf and in behalf of their co-members and substituting them as parties plaintiff. BLACK, J., in deciding that case, cited with approval the Buel case, Lottman v. Barnett, supra, and Ins. Co. v. Ludwig, 108 Ill. 514, and held the substitution of new parties plaintiff was not the commencement of a new suit.

The Ludwig case is instructive. It points out the distinction to be observed between amending by introducing a new party plaintiff and amending by introducing a new party defendant. The gist of the matter lies in one of the syllabi, viz: "Substituting a party having the legal right to sue, instead of one improperly named as plaintiff, is in no sense the commencement of a new suit, but so far as defendant is concerned the suit will be regarded as commenced at the time of the original issuing and service of the summons. The rule is different where a new defendant is brought into a case by amendment and summons against him."

In the Senn case MACFARLANE, J., said: "The nonjoinder of the father and mother would not abate the suit, though they were not joined until the period in which suit is required to be commenced, had expired." [Citing Buel v. Transfer Co., supra.]

The doctrine of the foregoing cases finds support in persuasive authority elsewhere. For instance, Floyd v. Floyd, 90 Ind. 130, was an action to contest a

will. Some of the interested parties commenced an action within the statutory period of limitation. After the statute had run other interested parties were brought in, and it was held the action was not barred as to any of the parties. This was an extreme case because the new parties were brought in as defendants. Now as to an amendment making new parties defendant after the limitation has run, the general rule is pointed out by BLACK, J., in Lilly v. Tobbein, supra, and in Ins. Co. v. Ludwig, supra; but the Indiana court, noting an exception, held the rule did not apply in a case where no judgment whatever could be rendered until all the parties are before the court. So that, the underlying principle of the exception pointed out in the Floyd case is applicable to the case at bar.

In Vunk v. Railroad, 56 N. J. L. 395, a husband sued alone for damages arising from trespass on land in which the husband and wife were respectively seized of an entirety. After the limitation period had run the wife was made a co-plaintiff and the amendment was held proper.

Bradford v. Andrews, 20 Ohio St. 208, was a will contest; and, quoting from a syllabus, it was said: "Where a proceeding for the contest of a will is commenced within the statutory period of limitation, although only part of the persons interested in the contest are made parties thereto, the right of action is saved as to all ultimately made parties, notwithstanding some of them are not brought into the case until after the period of limitation has expired."

In the case at bar, the cause of action under the amended petition was the identical cause of action counted on in the original. It substantially required the same *quantum* and quality of evidence. The measure of damages was the same under each. The amendment did not substantially change the claim or defense. Hence the general identity of the transaction was pre-

served, and we conclude there is no substance in the assignment of error in hand. [Scovill v. Glasner, 79 Mo. 449; Burnham & Co. v. Tillery & Co., 85 Mo. App. l. c. 457, *et seq.;* Rippee v. Railroad, 154 Mo. l. c. 364-5; Clothing Co. v. Railroad, 71 Mo. App. l. c. 246; Stewart v. VanHorne, 91 Mo. App. 647; Bricken v. Cross, 163 Mo. l. c. 453.]

II. For the orderly consideration of other questions it is necessary to note the grounds upon which recovery was sought, the defense interposed on the merits, and the facts uncovered by the evidence.

The petition grounded recovery on certain acts of negligence taken from the jury by instruction. They need no notice. Other specifications of negligence submitted to the jury are, in substance, that on the twenty-seventh day of August, 1901, the defendant so negligently handled and ran one of its cars on Ninth street, at an intersection named, at a high and dangerous rate of speed, to-wit, between fifteen and twenty miles an hour, through a populous and busy locality and without keeping said car under control and so negligently and unskillfully handled the car as to cause it to run over Morris Cytron as he was crossing the track in front of it, thereby so crushing and wounding him that he at once died. The petition then pleaded an ordinance well known as the Vigilant Watch ordinance, alleged a violation of said ordinance in that the motorman in charge of said car negligently failed to keep a vigilant watch for persons on foot on the track of defendant or moving towards its said car, and negligently failed to stop said car in the shortest time and space possible on the first appearance of danger to the person of said Morris Cytron, and that his dangerous position could have been seen by the exercise of ordinary diligence, etc. It is averred that the several acts of negligence aforesaid directly contributed to cause said car to crush and kill the child.

The answer was: First, a general denial; second. that plaintiffs negligently allowed their child to play upon the street at a time and place where the cars were constantly passing, and that said child negligently and carelessly went upon the track in front of or in such close proximity to the moving car that it was impossible for the motorman in charge of said car to stop the same, or, by any other means in his power, to avoid his injury.

Absent all evidence tending to prove the averment of the answer that plaintiffs negligently allowed their child to play about the street in dangerous proximity to passing cars, that issue became by-matter.

The reply was a general denial.

So much for the pleadings.

Attending to the facts, the case may proceed on the theory that some of them are not in doubt or dispute. For instance, it appears that defendant ran its cars on a single track on Ninth street; that Ninth street ran north and south, is about fifty feet wide, and is cut at right angles by Biddle street—of the same width as Ninth. It is not disputed that plaintiffs are the parents of Morris Cytron; that he was a little the rise of eight years old; that he was killed between eight and nine o'clock of the morning of August 27, 1901, by being run over by one of defendant's cars; that the car running him down was going north; and that the child was caught by it at or near the north line of the intersection of Ninth and Biddle. It was in evidence on defendant's part, without any attempted contradiction on the part of plaintiffs, that, commencing south on Ninth at the intersection of a street known as Carr avenue, the grade of Ninth (going north) is sharply downhill— the foot of the grade being at or very close to the south line of Biddle. The car in question was pretty well loaded with passengers. It stopped at Carr avenue to let some off or on. It then came on down the grade

until it overtook a coal wagon somewhere north of the middle of the block between Carr and Biddle. There it slowed up and rang its gong for the coal wagon to get out of its way. As we grasp the evidence, plaintiffs' witnesses do not undertake to give the speed of the car before it reached, or almost reached, the south line of Biddle street. On defendant's part it was shown that the car came down the incline from Carr to Biddle under the control of the brake. When it reached the foot or about the foot of the incline, which, as said, was close to the south line of Biddle, the motorman threw off the brake and turned on his power. The case is presented on both sides on the theory that the motorman saw the child from the time it left a certain point on the sidewalk on the west side of Ninth street until it was struck by the car. There is a dispute as to where this point was, but none as to its being on the sidewalk on the west side of Ninth. It was in evidence and undisputed that Ninth, as it leaves Biddle going north, is a very few feet wider than it is south of Biddle—say, five feet, and the track may be slightly deflected to the west at about the north line of the intersection of Biddle and Ninth. But this fact is somewhat debatable and is of no material force one way or the other, because it stands proved beyond question that at the intersection of Ninth and Biddle there were no obstructions to the view from curves, buildings or otherwise at the time in hand. The averment of the petition that the intersection of Ninth and Biddle was a populous and busy locality in the city of St. Louis was amply sustained by the proof. It was shown, too, that many children lived in that neighborhood and crossed defendant's track at the street intersection.

By actual measurement it was shown that between curbs on the south line of the intersection of Ninth and Biddle, Ninth street is thirty feet wide. At that point

205 Sup—45

from the curb on the east to the track is sixteen feet and from the west curb it is fourteen feet to the track. This being so, we infer the measurement was made to the center of the track, though the witness testified he made it from iron rail to the curb. Going to the north line of the intersection of Ninth and Biddle, from curb to curb Ninth street is thirty-four feet wide. The testimony of the party making the measurement was that from the north line of said intersection the track runs practically in the center of the street on north and is practically straight, though for a ways there is a slight curve of, say, six inches to the hundred feet. Biddle street is thirty feet from curb to curb.

From here on the testimony is a wilderness of hopeless conflict; and it may aid the understanding of the case to use the following diagram:

Referring to the diagram, much the greater weight of the testimony on both sides is that the child came out on Biddle street at "A," where his parents lived.    Plaintiffs put in proof to the effect that he passed east from "A" to "B" on the sidewalk on the south side of Biddle; that he then faced north and passed to "C," i. e., the northwest corner of the intersection of Biddle and Ninth; that his destination was a grocery store somewhere close to the northeast corner of Biddle and Ninth, on an errand for his mother; that to reach this store he faced east and passed on the north line of the intersection from "C" to "D," and there was caught by the car.  Some of defendant's testimony tended to show that Morris passed east from "A" and went into Ninth street at about "E," and then went diagonally (northeastwardly) across nearly the whole intersection of Biddle and Ninth, passing on the track at about "F" ("F" being, say, 10 feet south of the north line of the intersection), and was there caught by the car.  But defendant introduced an eye-witness (William Timmon) who was on the car and who testified that Morris did not go on Biddle at "A" or go on Biddle at all.  Timmon saw the boy run out of a gate at the rear of a store located on the southwest corner of Ninth and Biddle.  This gate he puts on Ninth, 30 feet south of the southwest corner of Ninth and Biddle, making it at about "G" on the diagram.  The child then went into Ninth (according to Timmon) as shown on the dotted line from "G" to "E"; and thence he passed in about the same general direction indicated by defendant's other testimony, to-wit, from "E" to "F".

If plaintiffs' testimony controlled the jury on this point, they must have believed that from the time the child turned at "C" and (facing east) passed into danger at "D," he went, say, from fifteen to seventeen feet in plain view of the motorman and heading to-

wards his death. If the jury ignored the testimony of plaintiffs and of defendant's witness, Timmon, and accepted the testimony of defendant's other witnesses, then they must have believed that Morris passed from the southwest corner of Ninth and Biddle diagonally to the northeast, on the dotted line B E F, constantly verging towards the track, and passed on it after having traveled under the eye of the motorman several feet more than plaintiffs' witnesses make him travel in going from "C" to "D." If, however, the jury accepted the testimony of Timmon, then we have him traveling over a considerably greater distance and going diagonally towards the track, on the dotted line G E F, and in plain view of the motorman.

Plaintiffs introduced testimony tending to show that the car crossed the intersection of Ninth and Biddle at a very high rate of speed. One witness put its speed at twelve to fifteen miles an hour; another at sixteen to seventeen miles an hour; others described the speed by phrases as "awful fast," or "it went whizzing down," or it went "pretty fast," or "just rushed through." Another witness said: "It was going fast, I couldn't gauge it with my eye, . . . well, it was running too fast." Being asked to place an estimate on its speed he put it at fifty miles an hour. Another witness said it was "running just like anything;" another that it went "very fast," and so on.

On defendant's side the motorman and conductor put the speed of the car over the intersection of Biddle and Ninth at from five to six miles an hour. One of defendant's witnesses put it at two and one-half miles. Another put it from seven to eight miles. Another said it was going "very slowly."

Apposite to the question of speed there was the same conflict in the testimony touching the distance in which the car stopped after the child was struck. Plaintiffs' evidence from several witnesses tended to

show that the car dragged the child on north to the middle of the block after it struck him before it was stopped. Another of plaintiffs' witnesses puts the distance as "about four or five city houses from the point where it struck until the point where it stopped." Another witness said it ran on north until the rear end of the car was forty feet north of Biddle street and then stopped, and so on.

On defendant's side the testimony tended to show, from the motorman, that the car was stopped with its front end forty feet from where it struck the child. The conductor testified he did not see the child before the car struck him; that when the car stopped his body was about four feet to the rear of the car and about three feet north of the crossing, and other proof of the same character was made. Another of defendant's witnesses testified that the boy's body was lying forty to fifty feet north of the crossing (i. e., the north line of the street intersection) and that the car was on north still farther, to-wit, the additional length of the car, say, twenty-eight or thirty feet.

One or two of plaintiffs' witnesses described the gait of the boy as "running." Some said he was "walking slow." Some said he was going neither slow nor fast, but "just like a boy would," or like an "American boy will." On defendant's side, to the contrary, the evidence makes the boy go very fast. The motorman testified he was going "three times faster than the car was running." One witness speaks of the boy as "shooting out," another as "darting out." One spoke of him as making jumps towards the car. Another said he was running at "breakneck speed." Another concluded Morris had been playing marbles and had grabbed his playmate's marbles and was making off with them and was being chased diagonally across the street.

And still other testimony of defendant was to the effect that one boy was chasing another.

On behalf of plaintiffs, evidence went in tending to show that the speed of the car was in no wise slackened before it struck the boy and that no effort whatever was made to slacken the speed. One witness gave it as his judgment that the child got on the track from ten to fifteen feet in front of the car. Another of plaintiffs' witnesses says *"it might have been a distance of about thirty feet."* On the other hand, the motorman says the boy got on the track two feet before the car; and testimony was introduced tending to show that every possible effort was made to stop the car after that.

Some of the witnesses on both sides did not have their attention called to signals; but the proof strongly tended on plaintiffs' side to show that no alarm signal was given, nor was the gong sounded while the car was crossing the intersection of Biddle and Ninth, or, to put it otherwise, while the boy was heading directly towards the track and into danger. On defendant's part the testimony, from those witnesses who testified on the point, was to the effect that the motorman gave the usual crossing signals for the crossing as he approached and passed over the street intersection and also gave an alarm signal—operated by his foot. It may be well to look closely into the testimony of Davidson, the motorman, because it is on that testimony error is predicated on the refusal of a certain instruction. He said partly in chief:

"A. This trip, and as I reached the south crossing at Biddle street and seen everything clear, I let off my brake, which spins around considerable, and throwed her onto five points. Just as I got her onto five points here a boy come out from the south—southwest corner, right off the curb, and before I could cut it off and get my brake he was in the center of the track.

In fact, past the center, about the time the fender hit him. He was going very fast; another boy behind him, and the other boy came very near getting into the track himself. . . . Just as soon as I seen the boy of course I grabbed for the brake. I had to stop the spinning. I had two turns and a half of the brake and I went somewhere about forty feet by the time I come to a stop. I seen the boy when he went onto the fender; seen him go over the side of it. I made the stop as quick as it possibly could be made. The car was running very slow; probably about between five and six miles an hour. I had just started to speed the car again as he run. Well, he was going so fast it was about three times as fast as the car was running. . .

. . The boy was probably four feet north of the crossing and where I struck him was about fourteen feet— about ten feet south of the crossing. He was running from the southwest corner to the northeast corner and the impetus of the car going when he fell on the fender carried him a little ways. . . . Q. How far did the car go ahead after it struck him? A. From where it struck him to the front end of the car where it stopped was about forty feet. . . . Q. What were you doing, and where were you standing? A. I was standing, just had left off the brake just as it struck the south crossing, seeing everything clear; let my brake off and just started feeding it up. Q. Did you see any boy coming towards your car at the time you let that brake off? A. No, sir, I did not. Q. Did you see any boy close to the track anywhere along there at that time? A. No, sir, I did not. Q. How close to the car did the boy step on the track? A. Well, it was so quick that you couldn't hardly tell. He was right there before you could say Jack Robinson; and the other boy right behind him. Q. Well, about how far, in your judgment, was the boy in front of the car when he stepped on the track? A. Well, when he hit the track he was only

about two feet ahead of it.  Q.  When he was running, you say, in a diagonal direction across?  A.  Yes, from the southwest to the northeast."

On cross-examination, Davidson testified he always slowed up at Biddle street to avoid coming in contact with people and vehicles; that he had to do that at every crossing; that he had come down the grade from Carr to Biddle slowly that morning; that the car was six minutes late; that when a car was late the motorman is "supposed to make a certain percentage of the time . . . and only runs safely to do so;" that he had a good hand-brake; that he was a large, strong man and weighed two hundred pounds; that he did not use the reverse; that the use of the reverse might "slide" the car "and might knock out the overhead," or "you would blow the fuse," and one would have to fall back "on the hand-brake, then, afterwards to make the stop;" that he, Davidson, had been in the business for years and was experienced and gave it as his opinion that the hand-brake is the proper thing to use in order to make a quick, sure stop; that his car going at five or six miles an hour could not be stopped in less than forty feet when the brake was let off; that in the condition his car was in that morning, to-wit, with the brake just let off, the car couldn't be stopped within forty feet.  We infer the slack of the brake had to be taken up; and the witness described his effort and ability to stop as follows:

"A.  In the condition that everything was there, with the brake off and so forth, it couldn't be stopped in less than forty feet with any kind of an appliance; that is, with a hand-brake, I tell you, for the simple reason when the brake is plumb off a thing jumps up before you, two turns and a half of a brake will take you two and a half seconds; five or six miles an hour will take you ten feet a second, and before you get the shoes in connection with that wheel you will go thirty

feet, and if you stop in the next ten you are doing well.
. . .

"Q. As a matter of fact, when you saw this boy, he was then right in front of the car? A. Yes, sir; right practically on the track, and if he had been half a second sooner he would have been over the track.

"Q. And as soon as you saw him there in front of your car you at once made all effort to stop it? A. I applied the brake to stop it, yes, sir."

Continuing, the motorman said there was no difficulty in seeing a boy or anything else approaching the track at the street intersection, and there were usually a great many people about those corners and that was why he went slow. On re-examination he drew a diagram making a diagonal mark to indicate the direction Morris took in approaching the track; and added: "And the boy never saw the car until the thing struck him, I don't believe; never heard the bell or anything."

Plaintiff put in evidence the Vigilant Watch ordinance, the terms of which have been spread so often in our reports that they may be assumed as known. [Deschner v. Railroad, 200 Mo. l. c. 324.]

On this record defendant's learned counsel assign error both in the giving and refusing of instructions. Of these in their order.

(a) The instructions of plaintiff are lengthy and the opinion need not be swelled by inserting them, *totidem verbis*. Among other things in the first instruction, the jury were pointed to the settled rule in judging of the alleged contributory negligence of the infant, Morris, as formulated by this court. [Holmes v. Railroad, 190 Mo. 98.] That instruction is not criticised by defendant.

In the second instruction the jury were told that if they found from the evidence that in view of such surrounding conditions at the crossing and such frequency of travel there, as they may find from the evidence to

have existed, ordinary regard and care for the safety
of deceased and others on said street at said crossing
required the ringing of a bell or other warning of the
approach of the car to be given, and found that the
motorman negligently failed to ring a bell, sound a
gong or give other warning of, etc., and found that be-
cause of a failure in that behalf the child was run over
and killed, and that his death was directly caused by
such negligence, and found from the evidence that the
accident would have been averted by the exercise of
ordinary care on the part of the motorman in so ring-
ing the bell, etc., and found that neither the child nor
his parents were guilty of contributory negligence (as
elsewhere defined) contributing directly to cause such
accident, then the verdict must be for plaintiff. This
instruction was the law under the facts in judg-
ment. [Wise v. Railroad, 198 Mo. l. c. 557, *et seq.*]

By plaintiffs' third instruction the jury were told
that if they found from the evidence that Morris was
killed at the crossing by one of defendant's cars and
found that defendant negligently ran its car at a rate
of speed which was high and dangerous and at a rate
at which a motorman of ordinary care and prudence
would not have run his car in view of the conditions as
to frequent use and occupancy of said street by per-
sons, as the jurors may find and believe from the evi-
dence said conditions to have existed at the time, and
that by reason of said dangerous rate of speed the child
was run over and killed, and found that his death was
directly caused by such negligent speed and found
from the evidence that if the car had not been run at
such dangerous rate of speed, but at a rate which the
jurors may find and believe from existing conditions
and surroundings would have been a safe and proper
rate of speed, said accident would by the exercise of
ordinary care on the part of the motorman in hand-
ling and stopping the car have been averted, then (in

the absence of contributory negligence as elsewhere defined), the verdict should be for plaintiff. We find no fault with this instruction. It was based on the evidence and properly declared the applicable rule of law. [Beier v. Railroad, 197 Mo. l. c. 230, *et seq.,* and cases cited.]

By plaintiffs' fourth instruction the jury were told, among other things, that if they found and believed from the evidence that the motorman was not keeping a vigilant watch for all persons, especially children, either on said track or moving towards it, or that said motorman, upon the first appearance to him of danger to Morris did not stop said car in the shortest time and space possible under the circumstances, consistent with the safety of the passengers and by the use of means at hand and under his control, and found from the evidence that said motorman by keeping such vigilant watch would have seen said child on said track or moving towards the same and in peril of being run over, and if by the exercise of ordinary care by so stopping said car in the shortest time and space, etc., under the circumstances and consistent with the safety of the passengers and by the use of the means at hand and under his control, he could have saved the child, and if the jurors further find and believe from the evidence that the failure to keep such watch or the failure to stop said car as aforesaid was the direct cause of the death of the child, then your verdict shall be for plaintiff (unless you find the child or its parents were guilty of contributory negligence as elsewhere defined). We find no fault with this instruction. The rule of law announced by it was but the application of the Vigilant Watch ordinance to the case and has been again and again approved by this court when applied to the facts in judgment.

(b) Defendant, among others, was given the following instructions:

"If the jury find from the evidence that defendant's motorman in charge of the car gave notice of its approach to Biddle street by ringing or sounding a bell or gong on said car, and shall further find that as said car so approached Biddle street and while crossing the same, said car was not running at a high or dangerous speed and shall further find that said motorman was exercising that degree of care that an ordinarily prudent and humane motorman would be expected to exercise under the same or similar circumstances to keep a watch for persons upon or approaching defendant's track, and that while so in the exercise of such care said motorman, immediately upon observing said deceased coming toward said car or track, began setting his brake and stopped the car as soon as possible with the means and appliances at his command, then plaintiffs cannot recover in this action and your verdict will be for defendant."

"If the jury find from the evidence that plaintiffs' deceased son was of sufficient age and discretion to understand and know the dangers incident to crossing street car tracks in front of moving cars, and shall further find from the evidence that said deceased went upon defendant's track in front of a moving car, without looking or listening for the same, at a time and place when and where, by the exercise of that degree of care that an ordinarily prudent person of like age and discretion would be expected to use under the same or similar circumstances in looking or listening for defendant's car he could have seen or heard the same in time to have avoided collision with it, then plaintiffs cannot recover in this action and your verdict will be for defendant."

And defendant assigns error in the refusal of two instructions, viz:

4. "If the jury find from the evidence that the death of plaintiffs' deceased infant son was caused by

the mutual and concurring negligence of said deceased and the defendant's motorman in charge of defendant's car, and that the negligence of either, without the concurrence of the negligence of the other would not have caused the injury, then your verdict must be for the defendant."

5. "If the jury find from the evidence that plaintiffs' deceased son passed suddenly upon defendant's track in front of its car and so close thereto that it was impossible for the motorman in charge of said car to stop the same in time to avoid collision with the said deceased, then plaintiffs cannot recover in this action and your verdict will be for defendant."

There was no error in refusing defendant's instruction numbered 4. Every principle of law applicable to the concrete facts, singular to the case, and relieving defendant from liability because of the contributory negligence, if any, of the child, had been given to the jury in plaintiffs' instruction number 1 and in the last one of defendant's instructions. [Mullin v. Railroad, 196 Mo. 572.] The refused instruction merely shaped the matter up in another form and did so by using a terminology well calculated to litter up the minds of the jurors and steer them afield or confuse them. When a proposition of law has once been fairly formulated and given, to turn about and couch it in a different and more learned phrase, is but tending to create darkness, to obscure the issue by a too great wealth of words, as many leaves conceal the apple on the bough. Twelve plain men in the box might well conclude that the refused instruction formulated a different proposition of law than the proposition embodied in other instructions given, and, in assigning it any office, whatever, might be caught in a net and tripped up, assigning it a wrong one.

Nor was there error in refusing defendant's in-

struction number 5. That instruction was by no means the law of this case. Because:

It ignored every element in the case leading up to the death of the child except the one incident of his getting on the track so close to the car that it could not thereafter be stopped in time to save his life, *viz*:

It fetched an unfairly narrow compass in circumscribing the field which the jury should explore in coming to a just and humane conclusion.

It ignored entirely the negligence of defendant.

It wiped out the Vigilant Watch ordinance as with one stroke of a sponge.

It denied to the jury the right to consider the fact that the car may have been run at a negligent speed under existing conditions and environment (of which there was much evidence), and that inability to stop might have been caused by that fact.

It told the jury not to consider the evidence tending to show that no bell was rung or warning given to the child, whereby he might have been kept off the track. The motorman knew his car was bound to occupy, with crushing force, the very spot the child's steps were directed to. It was obvious to the mortorman that the child did not know that fact. Under such circumstances, if means of notice were at hand (as they were) notice was demanded by the law. [Hinzeman v. Railroad, 182 Mo. l. c. 623, *et seq.;* Deschner v. Railroad, 200 Mo. l. c. 331, *et seq.;* Wise v. Railroad, *supra.*]

It took the jury's mind away from defendant's evidence tending to show that its motorman voluntarily gave up control of his car at the foot of a sharp grade, that he let go of and thereby turned off the brake, that he was feeding his power at the critical instant of crossing the intersection of two streets at a thickly-settled and busy part of the city where persons have the right to be and were expected to be and where questions of life and death might be reasonably forecasted

as likely to arise at any time; that when such question did arise the motorman was obliged to stop feeding his power and to catch a brake that had spun or was spinning off, to readjust it and bring its shoes in contact with the wheels (*i. e.*, take up his "slack"). Obviously the time and the place were ticklish, and it was for the jury to say whether the brake should not have been kept in touch with the wheels so that the brake shoes or skids might take hold and drag instantaneously. Observe, too, that the car had the momentum of coming down a grade, and it was for the jury to say whether it had sufficient power through that momentum (the place and time considered) without feeding the power until over the crossing. Observe, the motorman testified, in effect, that his car covered thirty feet and that precious time apparently was lost in getting the brakeshoes in contact with the wheels, and that (with the brakeshoes to the wheels) the car could be stopped in ten feet. All these were vital facts in the case made; and it would have been gross error to ignore them in an instruction covering the whole case, as this one did.

It told the jury to blink the fact that the child either walked, say, 15 feet directly to and then on the track under the eye of the motorman and into death (as testified on plaintiffs' behalf); or else ran diagonally, say, twenty or twenty-five feet, headed for the track and evidently bent on crossing it, as testified by defendant's witnessess. Both danger and duty began the instant the child left the sidewalk, bound headlong into peril. [Bunyan v. Railroad, 127 Mo. l. c. 21, *et seq.*]

That instruction took the life out of both the other instructions given for defendant, and, if given, would have made them so much waste paper. It was not supported by defendant's own testimony.

If given, in effect, it would have declared the law to be (when read in the light of the facts of this case), that the smaller the care and caution, the less the liabil-

ity; the greater the negligence, the greater the immunity; the more the law is violated, the wider open the door of escape from penalty. Such is not the law of any case. If there had been no evidence tending to show any negligence of defendant, and if, without such negligence, the deceased appeared so suddenly and so immediately in front of the car that it could not have been either stopped, or slackened, so as to avert the collision, a different case would be here.

The case was well tried. The judgment meets our approval. Accordingly, it is affirmed.

*Gantt, C. J., Fox, Valliant* and *Burgess, JJ.,* concur; *Graves, J.,* dissents on second paragraph, and concurs on first; *Woodson, J.,* not sitting.