ADOLPH HOVARKA, by next friend, v. ST. LOUIS TRANSIT COMPANY, Appellant.

Division One, November 22, 1905.

1. **NEGLIGENCE: Falling On Track.** Where a school boy, in attempting to cross a street railway track, slipped and hurt himself, and lay on the track trying to rise and pull himself off, and he testifies that when he first saw the car, after he fell, it was the width of three or four houses away, and the motorman testifies that he did not see the boy at all, that the track was an up-grade and the car could have been stopped in ten feet, and the evidence shows that he could have seen the boy for 200 feet or more had he looked, the court did not err in refusing to nonsuit the case.

2. ————: **Ordinary Care: Definition.** The degree of care covered by the words "ordinary care" varies according to the circumstances. The condition suggests the proper degree of care which a motorman in charge of a street car must exercise to avoid striking or running over persons on the track. And where there are children on the track coming from school, it is not proper to use the words "ordinary care" undefined and unexplained in the instructions; and, hence, the court did not err in striking out those words, and inserting in lieu thereof the

words "proper care to discover persons in danger of being injured, as such care is defined in other instructions," and in those instructions requiring the motorman to keep a vigilant watch, etc.

3. ———: ———: **Wrongful Definition: When Not Error.** Although the trial court may not have correctly defined the words "ordinary care," or failed to give instructions on the subject that clearly defined the words, yet if there was no room in the case for a question of the degree of care the motorman ought to have exercised, the court's short-coming in that regard could not possibly have injured defendant's case, and the error, if any, was harmless.

4. ———: **Instruction: Omission of the Motorman's Duty.** The instruction as asked told the jury that if plaintiff was old enough to appreciate the danger of running in front of a car, it was his duty to keep a careful lookout and keep far enough away to avoid a collision with the car, and that if by looking he could have seen the approaching car but failed to look and ran into the side or corner of the car, the verdict must be for defendant. *Held,* that the instruction leaves out of view the duty of the motorman in the emergency to discover the boy's perilous condition and to try to avert the accident, and was, therefore, properly refused.

5. ———: ———: **No Evidence.** The court is justified in refusing an instruction where there is no substantial evidence on which to base it.

Appeal from St. Louis County Circuit Court.— *Hon. Jno. W. McElhinney,* Judge.

AFFIRMED.

*Kiskaddon & Matthews* with *Boyle & Priest* for appellant.

(1) The mere fact that an accident occurred in which plaintiff was injured is no evidence of negligence on the part of the defendant. Fuchs v. St. Louis, 167 Mo. 620. (2) The rule *res ipsa loquitur* does not apply under the pleadings and evidence in this case. Bartly v. Railroad, 148 Mo. 138; Neville v. Railroad, 158 Mo. 293; Smith v. Railroad, 113 Mo. 82. (3) When

the testimony of plaintiff's witnesses contravenes the physical facts, such testimony has no probative force, and should be disregarded. Nugent v. Kaufman, 131 Mo. 252; Kelsay v. Railroad, 129 Mo. 376. (4) Where the testimony introduced by plaintiff affords no substantial ground for the allegation of defendant's negligence, the court should so instruct. Boyd v. Railroad, 105 Mo. 371; Smith v. Railroad, 113 Mo. 70; Roberts v. Tel. Co., 166 Mo. 384. (5) When the testimony introduced by plaintiff shows that he is guilty of contributory negligence, the jury should be instructed to find for defendant. Hudson v. Railroad, 123 Mo. 445, 101 Mo. 30; Curley v. Railroad, 98 Mo. 13; Van Bach v. Railroad, 171 Mo. 346; Giardina v. Railroad, 185 Mo. 330. (6) The fourth and fifth instructions as asked by defendant ought to have been given, and the court erred in modifying them and of his own motion giving them in their modified form. Bowles v. Hunter, 91 Mo. App. 337; Jordan v. Webber, 72 Mo. App. 328; Zimmermann v. Railroad, 71 Mo. 491; Yarnell v. Railroad, 75 Mo. 583; Abbott v. Railroad, 83 Mo. 278; Murray v. Railroad, 176 Mo. 190. (7) In the fourth and fifth instructions above mentioned the court changed the term "ordinary care" to the terms "proper care," and interlined a direction to the jury to other instructions for a definition of "proper care." No such other instructions were given. These instructions, as given by the court of its own motion, are erroneous for the changes and interlineations, and because as given they are not complete and are misleading. The court having undertaken to give the instructions ought to have completed them by giving the definition. Authorities cited to point 6 and the following instances where words were used in a technical sense, and it has been held they required definition: "Consequential damages" and "direct and immediate damages:" Railroad v. Dowley, 50 Mo. App. 487. "Heat of passion:" State v. Andrew, 76 Mo. 101.

"Warranty:" Flint v. Ball, 43 Mo. App. 510. "Premeditation:" State v. Harris, 76 Mo. 363. "Reasonable doubt:" State v. Christian, 66 Mo. 143. "Matters material to the issue." State v. Chyo Chiagk, 92 Mo. 416; State v. Miller, 100 Mo. 622. "Adverse possession:" Googher v. Niece, 75 Mo. 383; Dyer v. Brannock, 2 Mo. App. 432. "Gross negligence:" Mueller v. Ins. Co., 45 Mo. 88; Wiser v. Chesley, 53 Mo. 549; Mason v. Stock Yds. Co., 60 Mo. App. 100. "Due diligence:" Turner v. Railroad, 76 Mo. 263. "Acting in good faith:" Dry Goods Co. v. Schooby, 66 Mo. App. 415. "Material facts:" Digby v. Ins. Co., 3 Mo. App. 603. "Exemplary damages:" Hayes v. Railroad, 15 Mo. App. 584. It has even been held that the words "preponderance of evidence" are, with the average juryman, susceptible of, and very likely to receive, an infinity of construction. Clarke v. Kitchen, 52 Mo. 317; Carson v. Porter, 22 Mo. App. 185; Young v. Ridenbaugh, 67 Mo. 584. How much more then should the court, when giving an instruction of its own motion, define the term "proper care," a term unknown in its ordinary sense to the law of negligence, and especially should he do so when he refers in the instruction to other instructions for the definition. It is submitted that a failure to give the defining instructions in such case is error. (8) Negligence and ordinary care should be defined, or the instructions given should state under the evidence what facts constitute ordinary care and negligence, and submit the truth or falsity of the facts to the jury for their finding. Wiser v. Chesley, 53 Mo. 548; Mueller v. Ins. Co., 45 Mo. 88; Wyatt v. Railroad, 62 Mo. 410; Gorby v. Railroad, 93 Mo. 451;

*M. Hartman, A. L. Grace* and *R. L. Shackleford* for respondent.

.(1) The evidence is clear that at the time the boy fell upon the track, he did not see the car, and the car was at least seventy-five feet, and perhaps more, away

from him, and by the exercise of a vigilant watch, the defendant's motorman could have easily stopped the car, and averted the injury, and therefore the evidence makes out a strong case for the plaintiff, and the defendant's demurrer was properly overruled. (2) While it may be true that the mere fact that the boy was injured is not sufficient in itself to show liability as against the company, yet that fact, together with all the evidence in the case, clearly discloses the fact that the company's servants in charge of the car were negligent. (3) The sixth contention of the defendant is, that when the testimony introduced by plaintiff shows that he is guilty of contributory negligence, the jury should be instructed to find for the defendant. To this contention the plaintiff says that he was not guilty of contributory negligence, and was not guilty of negligence at all, for at the time he undertook to cross the railroad track, he had ample time to cross it, and would not have, and could not have been injured by the car, for the car was not within seventy-five feet of him, and but for the fact that, the track being muddy, he slipped and fell and injured himself so badly that it was impossible for him to recover from his stunned condition in time to leave the track, before the car had come upon him and injured him. Not only so, but the law is that the plaintiff is presumed to be in the exercise of ordinary care as defined in the instructions given the jury by the court, and the testimony in this case clearly shows, not only that the boy was not guilty of any kind of negligence, but did just what any person would have done under the circumstances. In cases where contributory negligence is to be established by those who contend for it, the testimony must show it by a preponderance of the testimony in order that the presumption of law must be removed, and in this case defendant signally failed to introduce a sufficient amount of testimony to overcome the presumption of the law that plaintiff was in the exercise of proper

care at the time he was injured, and also fails to establish that the boy was guilty of any negligence whatsoever. Jennings v. Railroad, 112 Mo. 268; Hilz v. Railroad, 101 Mo. 42; McPherson v. Railroad, 97 Mo. 253; Bowen v. Railroad, 95 Mo. 276; Crumpley v. Railroad, 111 Mo. 152; Weller v. Railroad, 164 Mo. 182. The law presumes plaintiff to have been in the exercise of proper care in going over the street at the crossing where he attempted to cross the street car track. Petty v. Railroad, 88 Mo. 320; Schlereth v. Railroad, 115 Mo. 87; Crumpley v. Railroad, 111 Mo. 158; Hutchinson v. Railroad, 161 Mo. 246. (4) The defendant is correct when it says that the term proper care is not known in the realm of negligence. Proper care simply means ordinary care, in the usual sense of the word, but as used by the court, was simply used as a reference to call the jury's attention to other instructions where the duty of the motorman in the exercise of his care was properly defined. Riska v. Railroad, 180 Mo. 168; Conrad Grocer Co. v. Railroad, 89 Mo. App. 391; Schmidt v. Railroad, 149 Mo. 282; Fath v. Railroad, 105 Mo. 537; Deitring v. Railroad, 109 Mo. App. 524.

VALLIANT, J.—Plaintiff, a ten-year-old boy, was run over by a street car of defendant and received severe injuries, resulting in the amputation of his left leg between the hip and the knee. He recovered a judgment against the defendant for $6,500, from which the defendant prosecutes this appeal.

The petition charges negligence in failure to observe the vigilant watch ordinance, also failure to observe the fender ordinance, and failure to sound a gong at the crossing. At the close of the evidence the court by instructions took away from the jury the questions of negligence relating to the fender and the gong, and submitted the case on the sole question of negligence in failing to observe the vigilant watch ordinance.

Plaintiff introduced the ordinance in evidence.

That ordinance appears in so many cases in our reports that it is unnecessary to copy it here in full, but of which it is sufficient to say that it requires the motorman to "keep a vigilant watch for all vehicles and persons on foot, especially children, either on the track or moving towards it, and on the first appearance of danger to such persons or vehicles, the car shall be stopped in the shortest time and space possible."

The defendant was operating a single-track street railroad which comes south on Mississippi avenue until it reaches Gravois street, and then continues its course southwest on that street.

According to the plaintiff's testimony the accident occurred in this manner:

The scene of the accident is shown in a diagram, in evidence, whereon appears Shenandoah avenue running from northwest to southeast and crossing Gravois street at an acute angle, also Salena street coming from the south and terminating in the plaza formed by the acute intersection of Shenandoah avenue with Gravois street. There are four crossings over Gravois street shown on this diagram; the first at or near Salena street, the second 88 feet and 6 inches west, the third 104 feet and 6 inches further west, and the fourth 108 feet still further west. At the first there is a slight curve in Gravois street, but from that point on west the street and track are straight. The evidence leaves it not entirely certain as to which of these four crossings was the one on which the plaintiff fell, but defendant's counsel seem to conclude that it was the third, and we think that they are correct in that. The street had been recently sprinkled and was slippery with mud.

The plaintiff was returning from school in the afternoon, going along the north sidewalk of Gravois street, aiming to cross over and go south on Shenandoah avenue. He left the sidewalk and ran south over the crossing until he reached the railroad track where he slipped and fell between the rails and hurt himself so that he

could not arise; he attempted to do so but fell again, and while lying there a car of defendant came along and ran over him, mangling his left leg and inflicting other serious injuries on him. The car had stopped at the first or Salena street crossing to discharge passengers and had attained a speed, estimated by the plaintiff's non-expert witnesses, of nine or ten miles an hour.

There was a man on the front platform of the car who was there for the purpose of receiving instructions from the motorman in the art of running a trolley car. This man and the motorman were at the time of the catastrophe and just before, looking at each other, talking and gesticulating. From the point where the boy left the sidewalk to cross the street he could have seen a car coming in his direction a distance of probably two hundred feet and when he reached the track in the middle of the street he could have seen it further, and the motorman could have seen him as well. Plaintiff testified that when he started across he looked in the direction a car was to be expected, but saw none; it was only after he had fallen and was lying between the rails of the track that he saw the car and it was then the distance of the width of "three or four houses." He said: "I slipped and fell down, and I had my head turning east when I saw the car coming . . . . I hurt myself in the right side so much that I couldn't get up. Q. How did you get off the track? A. Well I had my two feet in the track and I was getting my right foot out slow and when I was getting my left foot out the car caught me. . . . It ran my leg over right down here."

The only other eye-witness for plaintiff to the accident, Eugene Erdman, a boy thirteen years old, gave practically the same account of it that the plaintiff himself gave.

Counsel for appellant think that the testimony for defendant tended to show that the boy was running

across the street from the north sidewalk and after he had crossed to the south side of the track, a spring wagon in which were two women came along on that side going east, the horse running away, and the boy, to escape being run over by the horse, turned around and ran against the southeast corner of the car, fell and was run over.

The only witness for defendant who claimed to have seen the car strike the boy was August Bliefernich, and this is what he said: ''Well, I was standing right in front of my door and I seen the car coming up Gravois road and coming up right fast—not awful fast, but right fast, and I was just looking at the car, but I didn't see the car stopping, and I looked at the car and I looked at them school boys just coming from the school and in a little while I heard some women folks hallooing, and I looked at the car and I saw a little boy knocked down from the left corner of the front of the car and the boy tried to get up again, but the car knocked him down again and the car ran over him.'' He also said that after striking the boy the car ran sixty five or seventy feet, that two days afterwards he measured the distance. On cross-examination he was asked: ''Q. The two women in the wagon did you see.—A. I didn't see any women at all. That time when the boy was knocked down there wasn't any wagon at all there.''

Miss Queenan, a passenger on the car, a witness for defendant, came nearer sustaining defendant's runaway-horse theory than any other witness; this is what she said: ''I noticed two women coming down in a spring wagon driving awful fast and the window was down and I saw the women try to control the horse and just then a little boy ran across in front of the horse and right towards the car, and then the car stopped, and as I looked back I couldn't see anything and I got to the rear of the car and saw the conductor pick the little boy up.''

The motorman's testimony was to the effect that he stopped at the Salena street crossing, then started on again, and his attention was attracted by two women driving a light spring-wagon coming towards him about three or four car lengths ahead, and fearing that the horses were beyond control and might run into his car he checked his speed and rang his bell violently, when the women screamed, "and I saw that there was something wrong and I saw something run against the side of my car and I didn't know what it was until afterwards; I just got a glimpse of it." He said he never saw the boy at all, that at that time he was going up a grade about twenty-five feet to the block, was going not more than five miles an hour, and stopped the car as soon as the woman screamed, stopped within a car's length; that he was not talking to the man on the platform with him, but was looking ahead all the while. On cross-examination he said that if he saw a human being in danger he could stop the car going as it then was inside of ten feet.

The man on the front platform with the motorman testified substantially to the same effect. He did not see the boy at all, only knew that something had happened when he heard the screaming of the passengers in the car and the women in the wagon, then the motorman stopped the car.

I. At the close of the plaintiff's case the defendant asked an instruction to the effect that the plaintiff was not entitled to recover, which was refused and exception taken. The refusal of that instruction is the first assignment of error.

In support of that assignment appellant contends that there was no evidence of defendant's negligence, that the plaintiff's evidence showed that he was guilty of contributory negligence, and that the occurrence was an unavoidable accident combined with plaintiff's negligence.

We see no basis in the plaintiff's evidence for that contention. The plaintiff testified that he looked to the east but saw no car, and his witness said that when he had started across there was no car in sight. But even if this car had passed the curve in Gravois street so as to bring it into the view of the boy before he started across, it was too far away to render it dangerous or imprudent for him to attempt to cross as he did; under the conditions shown by his evidence, he would have safely passed over if he had not fallen in the track. And if the motorman from the Salena street crossing had seen the boy at that distance running across the street, he was so far away that he would have had a right to presume that the boy would cross before the car could reach him. Estimating the distance that the car was from that crossing which we have called the third, at the time the boy started to cross the street, in the light of the testimony of either the plaintiff or defendant, it was ample to have justified the boy, if he had been looking, in thinking that he could cross the track before the car would reach that crossing, and also to have justified the motorman, if he had been looking, in reaching the same conclusion. Therefore, no charge of negligence on the part of the boy can be predicated on his act in attempting to cross under those conditions, and no charge of negligence on the part of the motorman can be predicated on his act in not attempting to stop the car as soon as he saw the boy (if he had seen him) attempting to cross at that distance. There was nothing in the mere act of attempting to cross at that distance in front of the car to suggest the idea of danger to either the boy or the motorman.

But when the boy slipped and fell between the rails, attempted to rise and fell again, and lay there struggling to move his body out of the track —then the situation was changed — then if the motorman had been looking ahead he could not have failed seeing the boy and realizing his danger. The boy said that after

he had fallen and lay there trying to get out of the way he saw the car coming and it was then at the distance of "three or four houses" away; how far away he was when he first fell the evidence does not show, but even in the distance of three or four houses there was enough space in which to have stopped the car if the motorman had been observing. The motorman himself said that going as he was, at a slow rate and up-grade, he could have stopped the car without injury to anyone within ten feet. But if he had been going as fast as the other witnesses said he was, he could have stopped in the space of the width of three or four houses.

. The only escape from the conclusion that the injury was willful is in that that the motorman was negligent in not looking in that direction. The evidence for the plaintiff was that the motorman and the man who was on the platform with him were looking at each other, talking to each other and gesticulating.

It is, perhaps, unnecessary to discuss the defendant's evidence introduced to sustain the theory that the plaintiff ran into the car to escape being run over by a runaway horse, because the jury have passed upon it and that settles a question of fact under conflicting evidence in an appellate court, but we feel justified in saying that if the verdict had been for the defendant on that theory (and that is the only theory advanced) it would be very difficult to find any substantial evidence in the record to sustain it.

There was no error in refusing the instruction for a nonsuit.

II.    The defendant asked several instructions, some of which were modified by the court before they were given, and the modification of two of them is assigned as error.

One of these instructions as asked was to the effect that it was the duty of the plaintiff before going on the track to look and listen; that if by looking or listening he could have seen or heard the car, but failed to do

so, and went on the track so close to the car that the motorman, by the exercise of ordinary care, could not have seen him, then the verdict must be for the defendant, even though the jury should find that he would have crossed the track in safety if he had not fallen.

The other was to the effect that if the plaintiff went onto the track so close to the car that the motorman could not, with the appliances he had, stop it in time to avoid the collision, by the exercise of ordinary care, and that if the plaintiff had not placed himself in that position he would have escaped injury, then the verdict should be for the defendant, even though the jury believe if he had not fallen he would have crossed in safety.

The court struck out of these instructions the words "ordinary care," and inserted in lieu thereof in the first the words "proper care to discover persons in danger of being injured, as such care is defined in other instructions," and in the second the words "proper care and diligence to stop the car, as such care and diligence are defined in other instructions."

The only other instructions in which there was anything declaring what was proper care under those circumstances were the first and second instructions given for the plaintiff, in the first of which it is said: "And if the jury further find from the evidence that the defendant's motorman and conductor in charge of said car either saw, or by keeping a vigilant watch for persons on foot either on the track or moving towards it and in danger of being injured by said car would have seen plaintiff on said track or near it, and in danger from said car, and thereafter could have averted injury to plaintiff by using every effort to stop said car consistent with the safety of said car and its passengers, and failed so to do and thereby plaintiff was struck and injured by said car," and in the second instruction this: "and if the jury further find that defendant's motorman and conductor did not keep a vigilant watch

for persons on foot either upon defendant's track or moving towards it, and if they had kept such vigilant watch they would have seen the plaintiff on or near defendant's track and in danger of being struck and injured by said car and by stopping said car within the shortest time and space possible would have averted the injury to plaintiff and neglected to do so.'' Those were probably the ''other instructions'' referred to in the modifications.

Passing for the present over the question of whether there was any evidence on which to base those instructions as asked by defendant, the court would have been justified in refusing them as asked, because of the unexplained words ''ordinary care'' as defining the motorman's duty. The ordinance required the motorman to keep a vigilant watch, and on the first appearance of danger to stop the car in the shortest time and space possible, and in that respect under the circumstances of this case the ordinance imposed no stricter duty than did the common law. Here were children on the street coming from school, one of defendant's witnesses said ''a whole lot of them.'' That condition itself suggested the proper degree of care, and whilst it may be technically correct to say that all that the law requires under such circumstances is ordinary care, yet the degree of care covered by that term varies according to the circumstances. When we are instructing a jury we should make the technical term intelligible. The stereotyped definition of ordinary care serves well enough in many cases but is unintelligible and misleading in others. In 2 Thompson on Negligence, sec. 1424, it is said: ''The degree of care which the law demands of the street railway company, especially where it makes use of an underground cable or of an electric wire for the propulsion of its cars, is, no doubt, in legal strictness, defined by the words 'ordinary care.' But the use of this expression, in instructing a jury, would obviously mislead them, in the absence of further ex-

planation, by leading them to suppose that the street railway company discharges its duty to children on the streets by extending to them the care which ordinary persons use under ordinary circumstances. Such is not the law. The care here meant and demanded by the law is a degree of care proportioned to the danger to children, and, as in other cases, it increases with the increase of the risk of such danger. It is therefore a correct use of language to characterize it as a *high degree of care and watchfulness,* and to say that the motorman of an electric car is bound to exercise a high degree of watchfulness in operating the car in a public street where he has reason to expect that little children are playing near the track. Nor will this be a fixed measure of care under all circumstances, but will vary with time, place, and circumstances, increasing with the increase of the risks to be avoided. The law will, for example, demand greater care and vigilance in running an electric car over *a public street crossing* which is much frequented by children going to and returning from school, at a time when they may reasonably be expected to be using the crossing, than is demanded at other places. As young children are notoriously less capable of caring for themselves than adults are, the law demands of such a company greater vigilance and caution in keeping its car well in hand and in controlling its movements so as to prevent injury to small children, than it demands in the case of adults.''

The learned trial judge was right in refusing to give the instructions as asked defining the motorman's duty not more explicitly than by the words ordinary care, but he would have made the instructions less liable to misinterpretation if he had written another instruction expressly defining what he meant by proper care. Or he might with propriety have given the instructions as asked (if they had been otherwise unobjectionable) using the words ''ordinary care'' and then have followed them with another instruction defining

the term ordinary care as applied to the motorman's duty in that particular emergency.

But conceding that the modifications were lacking in perspicuity it could not possibly have injured the defendant's case.  There was no room in the testimony of either the plaintiff.or the defendant for a question of degree of care the motorman ought to have exercised. If the theory of the case as made by the testimony on the part of the plaintiff is correct, then the plaintiff would not have been run over by the car if the motorman had exercised even the slightest degree of care, and if the theory which counsel for appellant think the testimony on the part of the defendant tends to prove is correct then the motorman could not have avoided the injury if he had exercised the very highest degree of care possible.

The plaintiff either fell between the rails and lay there struggling to arise in plain view of the motorman when the car was at least seventy-five or a hundred feet away, or else he ran from the south side of the street and against the southwest corner of the car so suddenly that the motorman although he was looking in that direction did not see him at all.  Between these two conflicting and utterly irreconcilable alleged conditions, what possible effect could it have on the verdict of the jury to instruct them on the degree of care the law required of the motorman?  If the one story is true there was not the slightest imaginable degree of care shown, and if the other is true the exercise of the highest degree of care would not have averted the accident.

There was no error affecting the merits of the case to the injury of defendant in the modification in these instructions.

III.    The defendant asked but the  court refused this instruction:    "If the jury find from the evidence that the plaintiff was not upon the track upon which the car was moving, but ran into the side or corner of

the car, and was struck by the corner of the car and not by the fender, and that the plaintiff was of such age, judgment and discretion as to know and appreciate the danger of being so near the track as to be struck by a passing car, then it was the plaintiff's duty to keep a careful lookout for the approaching car, and keep far enough away from the track to avoid coming in collision with the car, and if the jury further find that the plaintiff could, by looking out for the approaching car, have seen the same coming in time to have kept far enough away from the track to avoid collision, then the plaintiff cannot recover in this action, and your verdict must be for defendant.''

Analyzed, the instruction means that if the plaintiff was old enough to appreciate the danger of running in front of a car, it was his duty to keep a careful lookout and keep far enough away to avoid such collision, and that if by looking he could have seen the car but failed to look and ran into the side or corner of it, the verdict should be for the defendant.

That instruction leaves out of view the duty of the motorman in the emergency entirely. According to the doctrine there declared, if the boy neglected to use his eyes and ran into danger, the motorman was under no obligation to try to avert the catastrophe, and was not blameworthy either whether by failing to look he did not see the danger, or seeing it he made no effort to avert it. That is not the law.

The court would have been justified in refusing this instruction on the ground also that there was no substantial evidence to sustain it. In their brief the learned counsel for appellant say that the evidence shows that the plaintiff ran safely across the track, then discovered his danger from the runaway horse and ran back into or against the car. There is no one witness who tells that story, nor can that theory be built up by adding the testimony of the witnesses together.

The motorman said that he was looking straight

ahead from the time he left the Salena street crossing, that he saw the women in the wagon and the horses apparently beyond control, they were three or four car lengths ahead of him when they attracted his attention, he rang his gong violently fearing they might run into him, he saw no boy at all but he heard the women in the wagon and the women passengers in the car screaming, he saw something run against the side of his car, what it was he did not know, and he saw that something was wrong, and therefore he stopped the car in about one car's length. If that testimony is true how was it possible for the boy to have first passed over the track in safety and then run back, thus passing to and fro across the direct line of the motorman's vision, while the motorman though looking ahead all the while did not see him at all? He saw the women and the horses plain enough and had no difficulty in making out what they were and he said he saw something strike his car but whether it was a boy or something else he had no idea.

The only witnesses for defendant who professed to have seen this child and the horse and the wagon at the same time were two young women passengers, much of whose inaccuracy of detail might with credit to them be attributed to the excitement of the catastrophe. One of these thought she saw a boy run like a flash across the front of the fast coming horse, but he passed out of her view before he reached the car; her testimony gives the impression that the boy was aiming to cross the street from the south to the north side, it gives no basis for the conclusion that he had passed over the track from the north side and retreated from the horse. The other one said that when the noise attracted her attention she looked up from a book she was reading and saw the wagon coming and at the same time saw the boy standing on the side of the track. Thus in the same moment of time one saw him running, one saw him standing, while the motorman who was in a better posi-

tion to see than either of them did not see him at all and the man standing by the side of the motorman did not see him. The other witnesses saw only one horse, while the motorman saw two horses in the wagon.

The only witness for defendant who professed to have seen the car strike the boy said that there was no horse or wagon there at all when the collision occurred; that when he heard women screaming he looked and saw a little boy knocked down by the car; the child tried to get up and as he was rising the car knocked him down again. We never heard of a car behaving in that way before.

There is no use to dwell upon the contradictions of these witnesses for defendant, we have only referred to their testimony to show that not one tells the whole story and the several stories cannot be put together to make out the hypothesis propounded in this instruction.

We find no reversible error in the record. The judgment is affirmed.

All concur, except *Marshall, J.,* not sitting.