STEPHENS M. HALE, Appellant, v. ST. JOSEPH RAILWAY, LIGHT, HEAT & POWER COM-ANY.

Division One, April 9, 1921.

1. **PERSONAL INJURIES:** Street Car: City Ordinances: Humanitarian Doctrine.  In an action against a street car company for personal injuries suffered in a collision between one of the company's cars and plaintiff's wagon, it appeared that ordinances of the city in which the collision occurred provided that the driver of every car should keep a vigilant watch for all vehicles and persons at or near the track or moving towards it, and on the first appearance of danger should stop the car in the shortest time and space possible, and that every car should have a gong and the gong should be rung in quick succession on approaching any team, carriage or person.  It also appeared that plaintiff, an aged man, was driving his wagon and horse slowly out of an alley into a street on which the car tracks were laid, and there was nothing to obstruct the view of the approaching car, though plaintiff testified that he did not see or hear it until it was upon him.  The motorman testified that his car was going nine or ten miles an hour; that as soon as he saw plaintiff's horse and wagon he sounded the gong, but did not slacken his speed or sound the gong in quick succession until within eight or ten feet of where plaintiff's horse crossed the track, and that the horse was five or six feet beyond the track.  The car hit the hind wheel of the wagon and threw plaintiff out.  Plaintiff testified that the horse was at no time going at a speed exceeding a fast walk.  Witnesses for plaintiff testified that they heard no gong sounded.  *Held,* that this evidence presented a question for the jury as to whether the motorman sounded his gong in quick succession, kept a vigilant watch for the plaintiff, and stopped his car in the shortest time and space possible after the first appearance of danger, as required by the ordinance and the humanitarian doctrine.

Hale v. St. Joseph Railway Co.

2. **NEGLIGENCE:** Car Company's Duty to be Vigilant. The fact that plaintiff may have been guilty of negligence in driving on a street car track without looking, or looking carefully, for an approaching car, does not relieve the company of its duty under ordinances which require it to sound its gong, keep a viligant watch and stop on the first appearance of danger to persons on the street approaching the track.

3. **CONTRIBUTORY NEGLIGENCE:** Humanitarian Doctrine. The fact that plaintiff may have been guilty of contributory negligence in going upon a street car track does not take his case for damages from the jury; the humanitarian doctrine is based upon the idea that the plaintiff may be guilty of contributory negligence and still may recover.

4. **CONSTITUTIONAL LAW:** City Ordinance Requiring Vigilance in Operating Street Cars. It is well settled by the decisions of this court that city ordinances are valid which impose upon motormen operating street cars in the city the duty of keeping a vigilant watch for persons on the track or moving toward it, and of stopping the car on the first appearance of danger in the shortest time and space possible, and of ringing the gong in quick succession on approaching any team or person.

5. **TIMELY WARNING:** Awaiting Apparent Peril. Under the vigilant watch ordinance in evidence the motorman cannot delay the sounding of his gong in quick succession until persons, teams or vehicles are actually going upon the track in front of his approaching street car or are in an actual position of danger; he must take affirmative action to give them timely warning of his approach.

6. **INSTRUCTIONS:** Ordinances Regulating Management of Street Cars. Where, in an action against a street car company to recover damages for personal injuries alleged to have been suffered through the negligence of the company's servants, it appears that there are controlling city ordinance regulating the management of the company's cars and imposing requirements looking to the safety of persons and property, instructions given which ignore these requirements are erroneous; and if such are given on behalf of the defendant, which authorize a verdict for defendant without requiring observance of these requirements, the fact that other instructions are given on the part of the plaintiff authorizing recovery by him if the requirements were violated does not cure the error.

Appeal from Buchanan Circuit Court.—*Hon. L. A. Vories*, Judge.

REVERSED AND REMANDED.

*John S. Boyer* for appellant.

Defendant's instruction 1 is erroneous.  It sets up a different measure of duty for the motorman than that prescribed in the ordinance requiring a vigilant watch for vehicles or persons moving towards the track, and requiring the going to be rung in quick succession on approaching any carriage or person.  This instruction excuses the motorman from sounding the gong in quick succession until there is actual danger.  This is not the law.  The ordinance requires a warning signal in quick succession on approaching any person whether in danger or not.  The very purpose of a signal is to warn a person so that he may avoid danger.  This instruction is in conflict with plaintiff's instructions 2, 3 and 4.  It purports to cover the whole case and directs a verdict, but ignores alleged and proven acts of negligence.  Hovarka v. Transit Co., 191 Mo. 441.  Defendant's instruction 2 is erroneous.  It purports to cover the whole case and directs a verdict but omits alleged and proven acts of negligence *per se*.  It entirely omits the negligence of defendant and the duty of the motorman to sound a gong when approaching plaintiff, and authorized a verdict for the defendant even though the jury might find and believe that the motorman violated the Bell Ordinance and that this failure caused the injury.  It is in conflict with plaintiff's instructions 2 and 4, defining defendant's duty to sound the gong and permitting plaintiff to recover if defendant's negligence to sound the gong caused the injury.  It is also contrary to the provisions of the Vigilant Watch Ordinance and omits the negligence of defendant.  It not only excuses defendant from giving a signal when approaching plaintiff, but limits the duty of defendant to bring its car under control and to take steps to avoid the injury only after plaintiff is in actual danger.  This is not the law.  Independent of the ordinance and where a case is submitted on the humanity rule alone it is for the jury to say whether the giving of an alarm would have aided in preventing the injury, and whether or not the motorman took proper steps to

bring the car under control when in the exercise of proper care he saw, or could have seen plaintiff going into danger. The motorman was not entitled to wait until the danger was imminent. Holzmer v. Railway, 261 Mo. 408; Ellis v. Railway, 234 Mo. 680; Dutcher v. Railroad, 241 Mo. 165; Kinlen v. Railroad, 216 Mo. 162; Cytron v. Transit Co., 205 Mo. 719; Deschner v. Railway, 200 Mo. 331; Kinzeman v. Railroad, 182 Mo. 625.

*Robert A. Brown* and *Richard L. Douglas* for respondent.

(1) The ordinance requiring the sounding of a gong upon a street car under certain circumstances, does not require that the gong shall be so sounded on the approach of any carriage or person toward the railway track. It requires the gong to be sounded in quick succession only when the street car is approaching some carriage or person. This necessarily means that the gong shall be sounded in quick succession only when the carriage or person is on the railway track or in a position of peril. It is the well-settled rule that the motorman upon a street car has the right to assume that any person approaching the track will stop and not pass over the same immediately in front of an approaching car, and it is only when a vehicle or person is in a position of danger, or when the motorman can see that such carriage or person will be in a position of danger that he is required to give a warning of danger or to slacken the speed of his car. Boyd v. Ry. Co., 105 Mo. 371; Draper v. Rys. Co., 199 Mo. App. 490; Flack v. Railroad, 162 Mo. App. 650; Frank v. Transit Co., 112 Mo. App. 496; Dutcher v. Railroad, 241 Mo. 165; Deschner v. Railroad, 200 Mo. 331. (2) If plaintiff was guilty of negligence in going upon defendant's railway track under the circumstances disclosed by the evidence, then under the well-settled law of this State, the defendant owed him no duty other than to exercise ordinary care to stop its car and to prevent injuring him. Grout v. Electric Ry. Co., 125 Mo. App. 560-562; Holland v. Railroad, 210 Mo. 351; Moore v.

Lindell Ry. Co., 176 Mo. 545.   (3)   When one testifies
that he looked for an approaching car and saw none,
when the facts show that had he looked he must have
seen, the Courts say that he in fact did see, and that his
statement to the contrary will avail him nothing.   Peter-
son v. Rys. Co., 270 Mo. 75; Murray v. Railroad, 176
Mo. 183; Mockowik v. Railroad, 196 Mo. 550; Underwood
v. West, 187 S. W. 86.

SMALL, C.—Suit for personal injuries arising from
collision with defendant's street car in the City of St.
Joseph.

The petition alleged:   That on January 30, 1918,
plaintiff was driving a horse and wagon across defend-
ant's railway tracks on Lafayette Street between 16th
and 17th Streets.   That before plaintiff had an oppor-
tunity to entirely cross said tracks, and without any
signal, warning or notice to plaintiff, defendant's
servants negligently and unlawfully ran one of defend-
ant's street cars against the wagon in which plaintiff
was riding, with great force and violence, whereby plain-
tiff was thrown from the wagon and greatly injured.
That defendant's servants in charge of said car, either
saw him and his vehicle on the tracks or approaching the
tracks of defendant, or by the exercise of proper care
could have seen him and said vehicle in time to stop
the car before striking the wagon.   That said servants
of defendant carelessly failed to keep a vigilant watch
for vehicles and persons, either on the tracks or moving
toward them, and carelessly failed to stop said car in
the shortest time or space possible on the first appear-
ance of danger to plaintiff, and carelessly failed to sound
a gong or give any warning to plaintiff of the approach
of said car.   By reason of all which plaintiff was injured.
That all of said acts of defendant were in violation of the
ordinances of the city of St. Joseph, Missouri, and in
violation of the law of the land.   Plaintiff asked judg-
ment for $10,000.

The answer admitted the ownership of the street car which collided with the plaintiff, denied all other allegations of the petition, and pleaded contributory negligence.

The plaintiff testified: That he was employed by his sons. Kept his horse and wagon at home between 16th and 17th Streets. That about one o'clock, on the day he was injured, he hitched his horse to go to the shop, and started north along the alley back of his house. The alley was a little up grade going north to Lafayette Street, which had double street-car tracks on it. The street cars turned onto Lafayette Street, coming north, half a block from where this alley intersected Lafayette Street. Plaintiff drove directly north, and when he got out of the alley, so he could see, there being a building on the southwest corner of said alley and Lafayette Street, he looked on the street and saw no car and heard no bell. He drove right along at the regular gait, did not see or dream of any danger. The horse was old, but "fairly at himself in every respect." He had driven the horse about ten years. The first he knew of the street car was when it was all over and somebody sat him up in the wagon. He thought he was able to go on to the shop. When he got there and got out of the wagon, he fell to the ground from his injuries, and was suffering with pain in his shoulder, neck and head. The street car people came after him and took him down to the doctor's office, where they gave him medical treatment for about three weeks. He was hurt in the hip and the side and otherwise. On cross-examination, he said: The barn where he kept his horse and wagon bordered on the alley and when he got to Lafayette Street, he looked and saw nothing from either way, nothing on the street at all, and heard no noise. He knew the car tracks were there. He had to pass the big barn on the southwest corner of Lafayette Street and the alley to look west. At that time, the horse's head would be passed the middle of Lafayette Street, between the curb and the middle of the street. From

the barn to the south track was about 20 feet.    The
.entire length of the horse was out in the street before
he could look west.  Looked west, but not until he could
see all the way through; when he looked he saw clear
down to 16th Street, which was one-half a block away.
The car that went east came north on 16th and then
turned east on Lafayette Street.  Guessed cars cannot
go fast around corners; they slow down then.  When
he looked west and saw no car on Lafayette Street, he
went straight across the tracks.  Did not look west after
that.    Did not know the car struck his wagon, until
after he came to sitting in his wagon.  Did not see nor
hear the street car before it struck.  His hearing was
pretty good, "fair to middling, or a little better."  His
sight very good.    No wagons on the street.  Nothing to
prevent his seeing down to 16th Street.  His horse walk-
ed tolerably fast across the street.  Witness was here
shown a paper, which he said he did  not sign.    The
signature shown him did not look exactly like his; if
he wrote it, it was when "I didn't know anything."
It was not his writing at all.  Witness denied stating to
anyone that as he drove into Lafayette Street he heard
a car turning at 16th Street.  Also denied stating he had
time to cross the tracks, and that when his horse was on
the track, he started to hurry the horse across and .he
slipped and before he could get his footing the car collid-
ed with the wagon, and threw plaintiff to the pavement;
or, stating, that when his horse was on the tracks, a
car was just turning east on Lafayette Street.  He saw
the street car there after the accident.  Did not  see
the motorman or conductor.  He was 81 years old.  The
accident happened in January, 1918.

Mrs. Augusta Emke, testified for plaintiff:  That
she lived at 18th and Lafayette Streets.  She was on the
car which struck plaintiff.  She was sitting in the front.
She heard a bump and looked, and the street car went
into the hind wheels of the wagon and she saw the man
fall out in the street.  She got out of the car and went
home immediately.  The collision happened between 16th

and 17th, near the place where the alley would cross the street. The man was thrown up in the air. She heard no bell nor gong ringing before the collision. Did not know or notice whether the car slackened any after it turned into Lafayette Street, before it hit the wagon. The car was past the alley when it stopped; even with the telephone post on the right hand side of the street. On cross-examination, the witness said: The car was going east. Witness was sitting on the right hand side of car, the south side. Did not know whether the car slowed down. Did not hear any bell, but had heard it ringing at 15th and 16th Streets, when they were there on Penn Street. She did not listen for a bell, but did not hear any just before the accident. Car hit the hind wheels of the wagon. Did not know the man. Conductor did not get her name, she ran off. Besides herself, there was one man on the car. Accident happened January, the year before the tri l.

W. A. McNeely, testified for plaintiff: He was a passenger on the car. Sat on the north side at the rear. Did not see collision, but heard and felt the shock. It was right where the alley intersects Lafayette Street between 16th and 17th Streets. The horse and wagon were on the north side of the south track after the collision; the wagon practically on the north track. Could not say whether the gong sounded before the collision, but he never heard it. He presumed he could have heard it, had it been sounded. The car was 10 or 15 feet east of the alley, when it stopped. Eastward Lafayette Street was down grade from 16th Street; quite a sharp decline for the first block. On cross-examination, witness said: Did not notice the rate of speed. Did not pay attention to ascertain whether bell was ringing on the car; would not say it did not ring; all that he would say, was, that he did not hear it. If the bell had rung, he might not have heard it; it was an even chance. After accident, plaintiff did not seem to know what he was doing, but drove off.

C. C. Madison, for plaintiff, testified: He was about one-half a block away, when the accident happened. Had

known plaintiff for six or seven years. First thing he knew was when he heard the car hit the wagon, he was at the northwest corner of 16th and Lafayette Streets. The whole block is about 300 feet long. Lafayette Street is about 40 or 50 feet wide; never measured. He went up to the place of accident and found Mr. Hale lying on the ground on the north car track. Rear end of the car was 10 or 12 feet east of east line of alley. Prior to collision, witness heard no bell ring. On cross-examination, witness said: Did not know about any bell ringing, paid no attention. Had come from the south on 16th Street, when he got to the northwest corner of 16th and Lafayette he heard the collision, prior to that, he had paid no attention whether bell was ringing or not; would not say bell was not ringing.

Dr. Hansen testified for plaintiff: He had been plaintiff's family physician. He was at plaintiff's residence when Mr. Teigh, defendant's representative, came to plaintiff's house the day of the accident. Teigh talked to plaintiff as the doctor was strapping plaintiff's back. Teigh told plaintiff he would like to have a statement of the accident, which plaintiff undertook to give. He remembered plaintiff said to Teigh, that the horse slipped on the track, but for which he would have gotten across. After statement was written, plaintiff signed it; he was perfectly conscious at the time. The witness was bandaging and dressing plaintiff, when the claim-agent was writing out the statement. Plaintiff was suffering at that time. Witness was a regular surgeon of the Street Railway Company, and had been for 16 years. Teigh brought the plaintiff in a taxi. Witness did not recollect that plaintiff said he whipped his horse. Remembered hearing plaintiff tell Teigh, that he heard no bell ring.

Plaintiff read in evidence Sections 1071 and 1078 of the Revised Ordinances of 1905 of the City of St. Joseph, which were as follows:

"Sec. 1071. . . . Fifth. The conductor or driver of each car shall keep a vigilant watch for all vehicles

and persons on foot, especially children, either on the track or moving towards it, and on the first appearance of danger to such persons or vehicles, the car shall be stopped in the shortest time and space possible.

"Sec. 1078. Cars to be fitted with gong—to be sounded, when—penalty. Every person or corporation owning or operating any street railway in this city, running cars, propelled by electricty or other power, shall cause every car or vehicle owned or operated by them to be fitted with a gong. It shall be the duty of such person or corporation to cause the gong on such car or vehicle to be struck or rung in quick succession on approaching any team, carriage or person, and approaching any street crossing within the city. Any driver,. motorman or other person, having charge of any such car or vehicle, and failing to strike such gong as herein provided, shall be fined for each offense not less than five dollars nor more than fifty dollars. [R. O. 1897, Chap. 62, Art. 1, Sec. 10.]"

On behalf of defendant, the motorman testified:

"Q. I believe on the day of the accident your car had come from 16th Street and was going north on Lafayette? A. Going east.

"Q. I mean east—I wish you would tell the jury where the plaintiff in this case was, or his horse, when you first saw it? A. I was about 50 feet, I guess, back from the alley.

"Q. West from the alley? A. West from the alley going east. I noticed the horse coming out of the alley and I began ringing my bell. Of course, the horse was going slow and I supposed he were going to stop. I had gotten about 8 or 10 feet, probably, of him and he began slapping his horse with his lines and the horse lunged out but it was too late for me to stop. I done everything I could then but it was too late. I judge I was about 12 feet from the vehicle, and I hit the wagon and the car run something like that distance after I hit the wagon.

"Q. When you saw this man whipping his horse in the manner you have described what did you do then

about your bell—if anything? A. I kicked the bell rapidly and began working my car to stop it the quickest way.

"Q. Did you pay particular attention to how far your car ran after you struck the wagon, notice anything? A. Not particular but not very far, because I was in a hurry to get out to assist Mr. Hale to see if he was hurt bad and got to him immediately.

"Q. About what rate of speed was your car running as you proceeded east on Lafayette Street? A. Ordinary rate of speed about nine or ten miles an hour out there.

"Q. You say the ordinary rate of speed is 9 or 10 miles an hour out there? A. I judge that was about the speed I was going. . . . "Q. What is located on the southwest corner of Lafayette Street and the alley, if anything? A. Shed or barn there.

"Q. What effect does that have on any one coming out of the alley—can you see them until they get out past that barn or shed there? A. Not after you get behind the barn you can't see them until they get out in the street.

"Q. Did you know who the man or woman was on your car? A. No, sir.

"Q. I wish you would tell the jury whether or not when you rang your gong when the man first came out into the alley whether or not Mr. Hale looked at you or in your direction? A. He looked right towards the car.

"Q. Would you tell the jury just what he did when his horse got closer—he whipped up—what did he whip u_ with? A. Just the lines.

"Q. And when he struck the horse what did the horse do? A. Started to try to lunge across the track.

"Cross-examination by Mr. Boyer.

"Q. How fast was the horse going when you first saw it? A. Well, a moderate walk.

"Q. The grade of the alley towards the car tracks is up hill, is it not? A. I believe there is some incline.

"Q. The horse was drawing the wagon and Mr. Hale up hill into Lafayette Street? A. Yes, sir.

"Q. You saw the horse coming out of the alley? A. Yes, I noticed the horse's head just as he came out from behind the shed. "Q. Is that the first you saw of Mr. Hale coming up the alley? A. Yes, sir.

"Q. The first you had seen him? A. Yes, sir.

"Q. Did the horse's speed change any from that time until the time he was right near the track? A. No

"Q. Continued just the same as he had been until he was very near the track? A. Yes, until he was in 5 or 6 feet.

"Q. Where was the horse when you saw Mr. Hale whip him up with the lines? A. His head was about 4 or 5 feet of the south rail.

"Q. Very close to the rail, was it? A. Five or six feet, yes.

"Q. Where was your car from him at that time? A. About 50 feet back, I guess—not 50 either, about that time about 10 or 12 or 15 feet, along there.

"Q. Now the speed at which the horse was going from the time you first saw his head coming out of the alley until he got onto the track or very near the track never changed—he continued to walk slowly all that distance, did he? A. The way it seemed to me, Mr. Hale looked around and he noticed that the car was coming and began to slap the horse and the horse's head then was five or six feet south of the south rail.

"Q. And you say at that time you were only within ten feet of him? A. Yes, ten or fifteen feet.

"Q. As you were approaching this alley, I understand, you saw the horse's head coming out of the alley? A. Yes.

"Q. You continued to run your car down Lafayette Street? A. Yes, sir.

"Q. And the horse kept coming at a slow walk towards the track until it was within about five feet of the track? A. Yes.

"Q. And your car was still running as it had been before—had you slackened the speed any? A. No, sir, I was just coasting along.

"Q. Had you put the brake on? A. Well, no.

"Q. You were running slightly down grade? A. Yes.

"Q. What kind of brake was on the car you were driving. A. Air brake.

"Q. Was the air working? A. Yes.

"Q. You applied it and stopped the car, did you? A. Yes.

"Q. After the collision? A. During the collision.

"Q. As a matter of fact you didn't stop until after the collision, did you? A. No.

"Q. Your car struck the wagon and then you ran on by some distance? A. Didn't have time.

"Q. When did you begin to try to stop your car? A. When I seen the man was going to try to run across the track ahead of me.

"Q. That is when you were within ten feet of this horse you then began to try to stop your car? A. Then is when he started to whip the horse. As soon as I saw him start to whip I seen he was not going to stop.

"Q. Let's get this correct—when you were within ten feet of Mr. Hale's horse, you then began for the first time to try to stop the car—is that right? A. Ten or fifteen feet.

"Q. Did you put the air on? A. I did then, sure.

"Q. And that is the first time you put it on? A. Yes.

"Q. How fast did you usually run your car around 16th Street into Lafayette and down east on Lafayette Street—what was your usual speed running down there? A. The usual speed I guess was 9 or 10 miles per hour. Of course you go slow around the curve. . . .

"Q. Isn't it a fact, as you stated it a while ago, that you didn't ring your bell until you were within ten feet of Mr Hale? A. That is when I rang it rapidly.

"Q. Began to stamp it with your feet—ten feet is about as far as you are from me, is it not? A. I judge nine or ten feet.

"Q. And that is the first time you rang this bell in quick succession? A. When I seen he was not going to stop. He was looking right at the car.

"Q. Did you ring it in quick succession until within ten feet of Mr. Hale's horse? A. I rang it in quick succession when I seen he was going to make the attempt to cross ahead of me.

"Q. That is, when you were within ten feet of him? A. Ten or fifteen feet.

"Q. And that is the first time you rang the bell in quick succession, was it? A. Well, yes, first time I remember.

"Q. How fast was this car going? A. When it collided with the wagon?

"Q. Just a little before the collision and as you saw him approaching and as you were approaching him, how fast were you running? A. As I say, about nine or ten miles.

"Q. Why didn't you ring the bell on this car when you first saw the horse coming out of the alley towards the street car track? A. I did but I didn't ring it rapidly. . . .

"Q. You think you were 50 feet west of the west line of the alley when you first saw the horse coming out of the alley? A. Yes.

"Q. How far is it from 16th Street to the alley alley where the collision happened? A. Half a block. I don't know the distance of a block there.

"Q. Is it the usual ordinary length of a block? A. It is an ordinary block.

"Q. About 120 feet, or 140? A. I don't know what length the block is; about 300 feet for the block and 150 feet for a half block.

"Q. How wide would you say the alley is? A. The alley is about 19 feet wide, I guess, or 20.

"Q. Who was your conductor? A. Schaeffer.

"Q. Was your air working well that day? A. Yes, sir, working good.

"Q. As a matter of fact, wasn't there some defect? A. No, defect.

"Q. Did you have sand on your car? A. I did.

"Q. Did you use sand in the endeavor to stop your car? A. Yes, air and sand. . . .

"Q. Let us not be mistaken about it—when you were 10 or 15 feet from the horse you say the horse lunged forward and you then immediately began to try to stop your car and did stop it in the shortest space possible—is that correct? A. Yes, sir.

"Q. Now how far did your car run before you stopped? A. I didn't measure the distance; don't know exactly, but not very far.

Q. Give the jury an idea. A. Might have been 20 feet, might have been 15 or 25, but it was not very far.

"Q. You ran by the alley, didn't you? A. Not very much, if any.

"Q. How much beyond the valley did the rear of your car go before you stopped? A. I don't think the rear of the car went beyond the alley.

"Q. You don't think the rear of your car crossed the alley? A. No.

"Q. Are you positive about that? A. Very positive, yes, sir. . . .

"Q. So you would say that about half of your car passed over the east line of the alley—is that your estimate? A. Something like that, yes, sir."

The conductor testified for defendant: The first he noticed was the rapid sound of the gong. Plaintiff had come out of the alley then, and was in the street five or seven feet from the car track. He was whipping his horse. The bell had been sounded all along after the turn into Lafayette Street. Saw the old man fall, but could not see the car hit the wagon. On cross-examination, witness said: It was a clear day. When the motorman sounded the gong in quick succession, Hale was within 6 or 7 feet of the car track, and the car was within 10 or 15 feet of him.

Mr. Teigh, claim-agent for defendant, testified: That he wrote up a statement of the accident given to him by the plaintiff which was read over to the plaintiff,

287 Mo.—33

as well as being read to him as it was written, and which plaintiff signed (statement is not copied in the record).

In rebuttal, plaintiff's evidence, that of the witness De Ford, was as follows: He had been a street car motorman for eleven years, and that the car in question, going ten miles an hour under the circumstances shown in evidence, should have been stopped within the length of the car, and that the car was 38 or 40 feet long. He was never discharged, but quit the company voluntarily.

The court gave the following instructions for the plaintiff:

"3. The court instructs the jury that if you find and believe from the evidence in this case that the plaintiff was, on or about the 30th day of January, 1918, driving a horse and wagon across the street car tracks of the defendant company, in a public street in the City of St. Joseph, Missouri, and that prior to the collision mentioned in evidence the plaintiff was upon or near to the said street car tracks of the defendant, and in a place of danger from approaching street cars; and if you further believe that the agents and servants of defendant company in charge of the street car which collided with plaintiff's wagon, failed to keep a vigilant watch for plaintiff and the vehicle in which he was riding, and upon the first appearance of danger to plaintiff or said vehicle, said agents and servants failed to stop said street car in the shortest time and space possible, and as a consequence thereof said car struck the wagon mentioned in evidence and injured plaintiff; and if you further find that plaintiff was not guilty of any negligence which contributed to his own injury, then your verdict must be for the plaintiff and against the defendant.

"4. You are further instructed that if you find and believe from the evidence in this case that prior to the collision mentioned in evidence the defendant's street car was approaching plaintiff and the wagon in which he was riding, and while so approaching, the agents and servants of defendant company then in charge of said

street car negligently failed to strike or ring in quick succession a gong upon said street car, and as a result of such failure to ring said gong in quick succession the car struck the wagon in which plaintiff was riding and injured plaintiff, and if you find that plaintiff was not negligent, as defined in other instructions, then your verdict must be for the plaintiff and against the defendant company.

"5.  If you find and believe from the evidence in this case that defendant's motorman in charge of the street car at the time of the collision mentioned in evidence either saw plaintiff, or by the exercise of ordinary care could have seen him either on or approaching the street car track and in a position of danger from passing cars, in time to have stopped the car by the exercise of ordinary care and with the means at his command before striking the wagon in which plaintiff was riding, and if you believe that said motorman negligently failed to stop said car after having seen plaintiff in a perilous position or by the exercise of ordinary care could have seen plaintiff in a position of danger, and in consequence of said negligence plaintiff was injured, then plaintiff is entitled to a verdict in this case, even though you may believe that plaintiff did not exercise the care for his own safety, in driving on or near said street car track, that an ordinary prudent person would have exercised under the same circumstances."

On behalf of defendant, the court instructed the jury as follows:

"1.  The court instructs you that the defendant railway company had the right of way over its tracks and that it owed plaintiff no duty whatever to stop its car or to slacken its speed until its agents in charge thereof saw, or in the exercise of ordinary care could have seen that plaintiff intended to drive upon its tracks ahead of the car and put himself in a position of danger, and if you believe from the evidence that as soon as its motorman saw, or in the exercise of ordinary care could have seen that plaintiff was going to drive on the tracks ahead

of the car or be in a position of danger he sounded the gong upon the car in quick succession and exercise ordinary care to stop his car in the shortest time and space possible consistent with the safety on his passengers and the machinery of the car, then under no circumstances can plaintiff have a verdict in this case, and your finding must be in favor of the defendant.

''2. The court instructs the jury that the mere fact that defendant's motorman saw plaintiff approaching its car tracks did not obligate the motorman to stop his car or to slacken its speed. Such motorman had the right to presume that plaintiff would not negligently drive upon the tracks where he would be struck by the car and that he would stop before going upon the tracks. The motorman had the right to so think and act until he saw or in the exercise of ordinary care could have seen that plaintiff was going upon the tracks ahead of the car or would be in a position of danger, and if you believe from the evidence that such motorman then exercised ordinary care to stop his car in the shortest time and space possible consistent with the safety of his passengers and the machinery of the car, then you must find your verdict for the defendant.

''3. You are instructed that the plaintiff had no right to rely solely upon any obligation which must have rested upon the defendant or its agents to prevent injuring him, and that it was his duty to exercise ordinary care to look out for his own safety, and if you believe from the evidence that plaintiff was guilty of negligence in diving upon defendant's tracks in front of defendant's car in the manner described in evidence, and that after plaintiff had placed himself in a position of danger, the defendant through its agents exercised ordinary care to stop the car and prevent injuring plaintiff, then he is not entitled to a verdict in any sum and your verdict must be in favor of the defendant.

''4. The court instructs you that the agents of the defendant operating the car described in evidence were only required to exercise such care in the management

and operation of the car as would have been exercised by a reasonably prudent person under like or similar circumstances, and if you believe from the evidence that defendant's agents in charge of its cars were in the exercise of such ordinary care at the time of the accident complained of as would have been exercised by a reasonably prudent person under like or similar circumstances, then you must find your verdict in favor of the defendant.''

The jury found a verdict for defendant, and plaintiff appealed to this court.

I.  We think there was evidence to go to the jury, both under the humanitarian doctrine and ordinances of the City of St. Joseph introduced in evidence by plaintiff,

Ordinances.   requiring the motorman to keep a vigilant watch for persons moving towards the track, and to sound his gong in quick succession, when he was approaching teams, carriages and persons. The motorman testified, he was going nine or ten miles an hour and did not slacken his speed, nor sound his gong in quick succession until within eight or ten feet of where plaintiff's horse crossed the track, and said horse was five or six feet south of the track. All the evidence shows, the car hit the hind wheel of the wagon. Therefore, the horse and wagon moved 20 or 25 feet, while the car was moving the last eight or ten feet before the collision, according to the motorman's evidence. From this it might be inferred, that the motorman was in error, when he said he applied the air and sounded his gong in quick succession, while the horse was yet five or six feet south of the track, as it is not likely the horse traveled twice as fast as the car. Plaintiff testified, that the horse at no time was going at a speed exceeding a fast walk. If so, it might be reasonably argued that the horse and, perhaps, the wagon was actually on the track before the motorman slackened his speed or sounded his gong in quick succession. Furthermore, plaintiff testified, he saw or heard nothing of the car or gong, and crossed the street wholly oblivious of danger. His witnesses also testified, they heard no gong sounded at all. So that,

in any event, there was a question for the jury as to whether the motorman sounded his gong in quick succession, kept a viligant watchout for the plaintiff, and stopped his car in the shortest time and space possible after the first appearance of danger, as required by said ordinances and the humanitarian doctrine.

II.    But defendant says, that plaintiff testified, that he looked west after he passed the barn and did not see the approaching car, and there being no obstruction, **Vigilance.** plaintiff's testimony on that point is contrary to the physical facts, because his eyesight being good, he must have seen, had he looked.    Therefore, he must be charged with seeing the car, as a matter of law, and that if he saw the car, then the failure to sound the gong was immaterial, citing Peterson v. Railways Co., 270 Mo. 1. c. 75; Murray v. Transit Co., 176 Mo. 183; Mockowik v. Railroad, 196 Mo. 550.

In each of these cases, the plaintiff testified, that he saw the car and the court held, therefore, that he needed no further notice of its approach and the sounding of the gong would have added nothing to his safety or knowledge of his danger.    But in this case, the plaintiff says, he did not see the car, although he says he looked, under circumstances in which we agree with defendant that he must have seen the car, had he looked. But it does not follow from this, that the law presumes he looked and saw the car and wilfully ran into certain danger, rather than that he failed to look at all or looked so carelessly and inefficiently as to amount to not looking at all.    The precise point involved—we cannot find—has ever been up for adjudication, but in laying down the proposition that "when to look is to see, it is of no avail for plaintiff to say he looked and did not see," and the plaintiff testifies, he did look, but failed to see, this court in one of the first and most thoroughly considered cases, Kelsay v. Railroad, 129 Mo. 1. c. 374, said: "One of two facts is true:    Either the plaintiff did not look with that care common prudence required of her, or she did not look at all, until too late to avoid the collision."

So, in Hayden v. Railroad, 124 Mo. 573—"where to look was to see"—the court assumed the deceased failed to look, rather than that he looked and saw and ran into danger wilfully or heedlessly. The court said, p. 573: "It will thus be seen that it was a physical impossibility for the deceased to have failed to see the approaching train, if he had looked in that direction. . . . Had he done so, there can be no question that he could and would have stopped his team until the train passed and then crossed over in safety." So in Hill v. Union E. L. & P. Co., 260 Mo. l. c. 103, where the Kelsay Case, 129 Mo. supra, is cited in the dissenting opinion of GRAVES, J., in which FARIS, J., concurs, it is said: "Had plaintiff looked as he proceeded up this pole, this case would not be here. . . . As plaintiff went up the pole had he looked at each step before touching it, the trouble would have been averted."

Of the two presumptions, it is most probable and reasonable, that plaintiffs so testifying in such cases failed to look at all, or looked so carelessly they did not see, rather than that they looked and saw the danger and plunged forward into it. So that, we must rule, that the fact, that plaintiff may have been guilty of negligence in driving on the track without looking or looking carefully for the approaching car, does not relieve defendant from its duty under said ordinances to sound its gong in quick succession, and keep a vigilant watch and stop on the first appearance of danger to persons on the street approaching the track as in said ordinances provided.

III. The fact that plaintiff may have been guilty of contributory negligence in going upon the track, does not take the case from the jury, because the humanitarian doctrine is based on the idea that plaintiff may be guilty of such contributory negligence and still the plaintiff can recover. The ordinances introduced in evidence, simply relate to the defendant's duty in oper-

ating its cars, and apply to cases where the
Contributory plaintiff invokes the humanitarian doctrine as
Negligence.    well as ordinary cases of negligence where
that doctrine is not applicable or involved at all.

IV.    That said ordinances are valid and prescribe
the duty of the motorman in operating said car, and
Validity.    that it was negligence *per se* on his part, if he
violated them, is well settled by the decisions
of this court. [Sluder v. Transit Co., 189 Mo. 107; Mc-
Hugh v. Transit Co., 190 Mo. 96; Hovarka v. Transit
Co., 191 Mo. 441; Cytron v. Transit Co., 205 Mo. 716-19.]

V.    (a). Instruction No. 1 given for defendant was
erroneous, because it only required the motorman to
Instructions.    sound his gong in quick succession in case the
motorman saw or could have seen by the ex-
ercise of ordinary care "the plaintiff *was going to drive
onto the track* ahead of the car or be put in a position of
danger." Whereas, said ordinances construed together,
required the motorman to sound his gong in quick suc-
cession, when he discovered or by the exercise of a vigi-
lant watchout ahead could discover that he was approach-
ing persons, teams or vehicles who were moving towards,
and who might go upon, the track or get into actual
danger, so as to warn them from so doing, and he can-
not wait before so sounding such gong in quick succession
until they are actually going to drive upon the tracks or
are in an actual position of danger. Said instruction
should have so informed the jury.

(b.) Instruction No. 2 given for defendant was erro-
neous because it entirely ignored said ordinance requiring
the gong to be sounded by the motorman and stated that
the motorman had a right to presume that plaintiff would
stop before going on the tracks. As we have just seen,
said ordinances required affirmative action on the part
of the motorman to give timely warning to persons
moving towards the tracks of his approach, so that they
would stop before going on the track. He had no right

to remain inactive and to presume they would so stop. Said instruction should not have been given.

(c)　Instruction No. 3, given for defendant ignored both said ordinances of the city and did not require defendant to do anything to prevent injuring the plaintiff until the plaintiff had placed himself in a position of absolute danger.

(d)　Instruction No. 4, given for defendant, also wholly ignored both of said ordinances. Said instructions Nos. 1, 2, 3 and 4, given for defendant, were, therefore, erroneous. [Cytron v. Transit Co., 205 Mo. 716-719; Hovarka v. Transit Co., 191 Mo. 441, l. c. 452 *et seq.*]

VI.　The fact that plaintiff's instructions Nos. 3 and 4 authorized a recovery for plaintiff, if said ordinances were violated, does not cure the vice of the instruc-

**Cure.** tions aforesaid given for the defendant, because each of said instructions directed a verdict for the defendant without reference to said ordinances. They were simply contradictory to and neutralized the effect of the said instructions given for the plaintiff based upon said ordinances. "They wiped them out, as with a sponge." [Cytron v. Transit Co., 205 Mo. 716-19.]

For the errors aforesaid, the judgment is reversed and the cause remanded for another trial in accordance with the law as indicated in our opinion. *Brown* and *Ragland, CC.,* concur.

PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. All of the judges concur.